[No. 53458-6.   En Banc.   March 17, 1988.]

THE STATE OF WASHINGTON, *Respondent,* v. DARRELL PAUL CISKIE, *Appellant.*

*Thomas C. Phelan* and *William K. Thayer,* for appellant (appointed counsel for appeal).

*Arthur D. Curtis, Prosecuting Attorney,* and *James M. Peters, Deputy,* for respondent.

*Michael J. Trickey* on behalf of Washington Association of Criminal Defense Lawyers, amicus curiae for appellant.

*Deborah Whipple* on behalf of Northwest Women's Law Center, amicus curiae for respondent.

UTTER, J.—In this case, the trial court admitted expert testimony to assist the jury in understanding the behavior and mental state of a crime victim. The victim alleged she had been raped at least four times while engaged in a relationship with the appellant which lasted over a period of almost 23 months. In *State v. Allery*, 101 Wn.2d 591, 682 P.2d 312 (1984), this court held that in the applicable circumstances where a murder defendant raises a claim of self–defense, the defense may offer expert testimony to assist the jury in assessing the defendant's perception of the threat posed by the murder victim at the time of the homicide. Here we have the question of when, if ever, the State may appropriately offer the same type of expert testimony to assist the trier of fact in understanding the mental state of a crime victim.

At the heart of this issue is the question of whether we will extend the benefit of concepts this court has applied to defendants charged with a crime to those who are victims of a crime. Neither logic nor law requires us to deny victims an opportunity to explain to a jury, through a qualified expert, the reasons for conduct which would otherwise be beyond the average juror's understanding.

The trial court acted properly under the provisions of ER 702. Other claims of error in admission of testimony, jury instructions, claims of prosecutorial misconduct and of ineffective assistance of counsel are without merit. Accordingly, we affirm the trial court.

The parties largely agree on the facts, but for those comprising the assaults. Appellant Darrell Ciskie and the victim, C.H., met on November 24, 1981, at a lounge. They began an intimate relationship that evening that continued into October of 1983. C.H., a 55–year–old bookkeeper, had been divorced once, after a 29–year marriage, and had 3 grown children. Some 11 months before meeting Ciskie, she underwent mastectomy surgery for cancer. She testified that Ciskie was the first man she was involved with for any period of time since her divorce. At the time they met, Ciskie was employed as a car salesman. Ciskie was fired

from his job in July 1982 (about 7 months into the relationship) for drinking too much. He spent many nights at C.H.'s house, although, at her insistence, he always maintained a separate residence. Her sons testified that when they first met him, they had a favorable impression of Ciskie as a nice, friendly person.

In October 1982, their relationship began to change. Ciskie displayed fits of anger. He frequently asked C.H. for money and the use of her car. She testified she attempted to "cool" the relationship, but Ciskie harassed her, calling her repeatedly on the telephone at her own home and while she visited friends. Yet, despite this, she would see him when he asked her. She took him to meals, frequently let him use her car, cleaned for him, took him to the liquor store, and occasionally slept with him. During this time she attempted to persuade Ciskie to go to Alcoholics Anonymous.

The sexual activity in the relationship continued, but changed in character. C.H. testified that on January 12, 1983, they had a "big fight" after Ciskie had been drinking. She testified they had a "physical fight, because I didn't want to go to bed with him. And I lost." Report of Proceedings, at 151. C.H. testified that the next day Ciskie called her "at least eight times." Report of Proceedings, at 152. She said that during the calls Ciskie would apologize for what he had done, and tell her he'd never hurt her again. This incident was not the basis of criminal charges.

Two days after this alleged assault, C.H. and Ciskie took wine to another couple's home and the four of them went to a restaurant. She explained that she "felt sorry for him," that he hadn't a friend in the world, and that "there was not one other person in this world that would help him." Report of Proceedings, at 162.

The incidents that comprised the four counts of rape of which Ciskie was ultimately convicted occurred on January 28, April 9, July 3, and October 15, 1983. Evidence which the jury was entitled to believe showed the following. On January 28, 1983, Ciskie called to complain that he had

nothing to eat, and to ask her to take him shopping. C.H. arrived to find him drunk, disheveled and unshaven, and went to the store herself because of his condition. When she returned with groceries, Ciskie locked the door, and told her he had decided to kill her. Ciskie produced a 9-inch, wooden-handled fillet knife from between the box springs and the mattress, and told C.H. he had decided that if he could not have her, no one else could. The victim testified Ciskie held the knife and ordered her to disrobe. She complied, crying and pleading. C.H. testified Ciskie threatened to gouge her eyes out, and to put the knife into her vagina and twist it if she didn't comply with his commands. He also threatened to cut her other breast off. He then forced her to have intercourse, after which he passed out. C.H. hid the knife in a closet, threw on her coat and pants, carried her shoes and the rest of her clothing, and ran out of the apartment.

A few days later, Ciskie telephoned, apologizing and promising to go to Alcoholics Anonymous. C.H. and a son and grandson took Ciskie to the Clark County Alcohol Center the next day. This pattern of relatively amicable interactions, increasing tension, and violent sexual attacks was repeated throughout the remainder of the relationship. On April 9 and July 3, 1983, C.H. testified Ciskie forced her to have sexual intercourse with him. She testified she felt she had a choice of being raped, or fighting and risking injury or death, and therefore submitted. These incidents were charged as counts 3 and 4 of the information, respectively. Ciskie called within a few days after each incident to apologize and ask for favors or a visit.

Ciskie telephoned several times on October 15, 1983, asking for money. Although C.H. told him not to, he drove to her home and helped himself to several large glasses of bourbon from a bottle she had set out for friends earlier. C.H. testified Ciskie continued to talk, and she remained silent and listened, fearful of beginning an argument. He told her to drink, despite her protestation that she did not wish to drink in his presence, and her repeated assertions

that she did not want him to be there. Ciskie rubbed her neck, and said he wished to go to bed with her. C.H. repeatedly said she did not want to. Ciskie took her by the arm, and C.H. followed him to the bedroom without resisting because she was afraid.

C.H. testified Ciskie then proceeded to threaten and then to assault her sexually in a violent and humiliating fashion, striking her in the face, engaging in forcible sodomy and fellatio. Although C.H. was in considerable pain and fear, Ciskie twisted her breast with his hand and forced her to tell him that she enjoyed what he was doing. He put his fingers in her vagina and said "I'm just going to rip you clear apart." Report of Proceedings, at 329. He pulled her by the hair to force her to do as he wished, and threatened to return the next evening with more men to assault her again. When C.H. needed to go to the bathroom during the evening he went with her and held her by the arm to keep her there. She testified that he berated her constantly, calling her a "fucking bitch," and saying "[a]ll your girlfriends are fucking bitches." Report of Proceedings, at 332.

C.H. testified she could not escape during the night because he held her, and when he dozed off he kept an arm and leg over her body. When she did try to escape, he would wake and begin to abuse her again. Finally, they both fell asleep. C.H. said at around 9:30 a.m. she grabbed her bathrobe and unlocked and opened the patio door so that she would have an escape route. She testified she retreated 20 feet into her entry hall, and shouted at Ciskie to get up and leave. He asked for coffee and a shower, but she continued to shout at him, and he left.

C.H. testified she locked all the doors, tying the front door shut. She noticed an article on the front page of the newspaper about a domestic dispute that culminated in a murder. C.H. testified: "I just started reading it and I said to myself, '[I]f you don't do something right now, your kids are going to be reading your name in the paper. Just like this.'" Report of Proceedings, at 335. C.H. telephoned a

friend who is a deputy sheriff, and this prosecution followed.

At trial, the defense characterized C.H.'s presentation as overstated dramatics. In his opening statement (made before the State presented its case), defense counsel attacked C.H.'s credibility, describing the State's case as "exaggerated" and "carefully rehearsed." Opening Statements, at 23. Several witnesses testified to having seen C.H. during the period at issue with bruises and lacerations. Ciskie testified that the victim "got marks on her—gets marks on her real easy" from minor accidents. Report of Proceedings, at 885.

Defense counsel told the jury in his opening statement that

[t]he evidence will show that [C.H.] was actually not a dependent–trapped woman, as [the prosecutor] would have you believe, but that she was an independent woman; hardly a prisoner in her own home.

Opening Statements, at 26. Appellant maintained that all sexual relations between the parties were "on a consensual basis throughout." Opening Statements, at 28.

Ciskie alleged that on the occasions comprising counts 1 and 2, he was suffering from blackouts induced by many years of alcohol abuse, during which he was unable to perform sexually. In rebuttal, the State offered the testimony of Ciskie's two ex–wives that he was able to perform sexually when he had been drinking heavily and informed them later that he had experienced a blackout. On cross examination, the expert witness on alcoholism for the defense agreed that while experiencing a blackout, alcoholics are commonly able to engage in sexual relations and other activities, although they may have no recollection of having done so later.

Appellant testified that during the occasions charged as counts 2 and 4, C.H. voluntarily participated in sexual intercourse with him. Ciskie testified that the only physical violence he ever exerted against C.H. was on April 9, 1983, when he slapped her (giving her a black eye) in response

after she, unprovoked, slapped a drink from his hand. Appellant testified that C.H. was able to "stand up to him" and would have easily been able to call the police at any time, if it had truly been necessary. Report of Proceedings, at 919. Ciskie was convicted of one count of rape in the first degree, two counts of rape in the second degree, and one count of rape in the third degree.

## I

■ Ciskie argues the trial court erred in admitting expert testimony for the prosecution during the State's case in chief. The trial judge also admitted an expert witness on behalf of the defense, Dr. Moore. Moore testified before the jury that C.H. and Ciskie were "coalcoholics," to explain the dynamics of their relationship and the personality transformation undergone by C.H. from a cheerful, outgoing person to a tearful, unsure and frightened woman. No issues regarding the use of Dr. Moore's testimony have been raised on appeal. The testimony proffered by the State described the battered woman syndrome as a subgrouping of the broader diagnosis of post–traumatic stress disorder.[1]

ER 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The admissibility of expert testimony under this rule

---

[1]Counsel for appellant and amicus argue that battered woman syndrome and rape trauma syndrome are essentially the same. This characterization is not precise, however. The testimony proffered by the State discussed the battered woman syndrome as a subgrouping of the broader diagnosis of post–traumatic stress disorder. The trial judge, who showed great skill in this very difficult case, carefully distinguished between rape trauma syndrome and the battered woman syndrome. The court ruled specifically that the State's expert could not use the phrase "rape trauma syndrome," because of its potentially inflammatory effect upon the jury.

depends upon three factors: whether (1) the witness qualifies as an expert, (2) the opinion is based upon an explanatory theory generally accepted in the scientific community, and (3) the expert testimony would be helpful to the trier of fact. *State v. Allery,* 101 Wn.2d 591, 596, 682 P.2d 312 (1984), citing *State v. Canaday,* 90 Wn.2d 808, 585 P.2d 1185 (1978) and 5A K. Tegland, Wash. Prac., *Evidence* § 288, at 25 (2d ed. 1982).

### QUALIFICATIONS OF EXPERT

The expert called by the State in this case was Karil Klingbeil, whose testimony on the battered woman syndrome was admitted in two cases previously considered by this court: *State v. Allery, supra,* and *State v. Kelly,* 102 Wn.2d 188, 685 P.2d 564 (1984). At the time of trial, she was an associate professor at the University of Washington, director of social work at Harborview Medical Center, and head of the Sexual Assault Center at Harborview. Klingbeil is a social worker specializing in the area of family violence. She has published in her field in nationally recognized professional psychiatric journals, as well as in lay journals such as Time and Newsweek magazines. She is a member of many professional boards and committees, and testified to participating in the assessment and treatment of over 2,200 women complaining of battering. Klingbeil's credentials were, as in the *Allery* case, "well-established at trial." *Allery,* at 596.

### ACCEPTANCE OF THEORY IN SCIENTIFIC COMMUNITY

This court has already determined in *Allery* that Klingbeil's methodology in the diagnosis and treatment of battered women has received general acceptance in the community of mental health experts. Researchers studying battered women agree that they share the personality traits characteristic of women suffering from post-traumatic stress disorder described by Klingbeil in her testimony.

Walker, Thyfault & Browne, *Beyond the Juror's Ken: Battered Women,* 7 Vt. L. Rev. 1 (1982); J. Giles–Sims, *Wife–Battering: A Systems Theory Approach* (1983); 2–3 *Victimology* (1977–78) (special issue on spouse abuse and domestic violence); R. Dobash, *Violence Against Wives* (1979); M. Pagelow, *Woman–Battering: Victims and Their Experiences* (1981); W. Stacey & A. Shupe, *The Family Secret: Domestic Violence in America* (1983).

### Usefulness to Trier of Fact

The main issue before the court for resolution is whether expert testimony on the battered woman syndrome would be helpful to the trier of fact where an adult victim was engaged in an intimate relationship with the accused, where several attacks occurred, and yet the victim failed for a number of months to end the relationship, either by breaking it off or reporting the attacks to law enforcement authorities.

The trial court ruled specifically that Klingbeil could not offer an opinion as to the ultimate issue in the case—whether Ciskie raped C.H. Judge Morgan ruled:

> Mrs. Klingbeil's explanation is not the only explanation for failure to report. There are other explanations such as the effect of alcohol, or the effect of the mastectomy.
>
> . . .
>
> What Mrs. Klingbeil, then, is really testifying to as her testimony is offered by the State, is Mrs. [H]'s state of mind. I rule that that's relevant . . . as the basis for inferring why Mrs. [H] acted or did not act in certain ways, failing to report or failing to break off the relationship. It may not be used as the basis for inferring what Mr. Ciskie did or did not do. . . .
>
> . . . I do limit the use of Mrs. Klingbeil's testimony to Mrs. [H]'s state of mind and the inferences that can properly be drawn from the foundation, that is Mrs. [H]'s state of mind. Those do not include Mr. Ciskie's actions.

Report of Proceedings, at 1046–47.

Domestic violence is a widely prevalent and underreported phenomenon. "The general public is unaware of the

extent and seriousness of the problem of domestic violence." United States Comm'n on Civil Rights, *The Federal Response to Domestic Violence* 77 (1982). Lenore Walker, author of the learned treatise mainly relied upon by Klingbeil in her testimony, estimates that, at most, 1 in 10 incidents of battering are reported. L. Walker, *The Battered Woman* 19, 64 (1979). Other authorities estimate there are as many as 6 million battered women per year in America. Waits, *The Criminal Justice System's Response to Battering: Understanding the Problem, Forging the Solutions,* 60 Wash. L. Rev. 267, 273 (1985).

Sexual assaults as a part of that battering are not at all rare. Walker found in a study of over 400 battered women that 59 percent reported that they had been forced to perform sexual acts against their will by their mates, including acts the women considered particularly abusive or unnatural. L. Walker, *The Battered Woman Syndrome* 48 (1984). *See also* D. Russell, *Rape in Marriage* 87–101 (1982). Walker's study also found that there are a number of sexual issues that have been associated with battered women, the most salient of which is the impact of repeated sexual coercion and assault by someone who is capable of engaging in tender and loving sexual relations at other times. L. Walker, *The Battered Woman Syndrome* 47 (1984).

Battering victims respond to the violence they experience with overwhelming terror, shame, and guilt, as well as condemnation due to their inability to leave the situation. Ferraro & Johnson, *How Women Experience Battering: The Process of Victimization,* 30 Soc. Probs. 325 (1983). The State notes that an estimated 43 percent of all battered women talk to no one about the beatings they experience, citing M. Schulman, *A Survey of Spousal Violence Against Women in Kentucky* 3 (1979).

We find that the trial judge could reasonably conclude the jury probably had little awareness of the topic of Klingbeil's testimony. The State noted before the trial court that for those not personally affected by a battering relationship or otherwise specially informed, it is difficult to

believe that so many women are victims of their mates' physical abuse. Even more counterintuitive and difficult to understand is the ongoing nature of these relationships. The average juror's intuitive response could well be to assume that someone in such circumstances could simply leave her mate, and that failure to do so signals exaggeration of the violent nature of the incidents and consensual participation.

The Ninth Circuit Court of Appeals agreed that similar testimony could be of use to the trier of fact in understanding the mental state of victims of battering and sexual abuse that lasted over a period of time. In *United States v. Winters,* 729 F.2d 602 (9th Cir. 1984), the defendant was charged with kidnapping two women and transporting them in interstate commerce for immoral purposes. The prosecution introduced testimony to the effect that the defendant beat, raped, and forced the women into acts of prostitution during a journey across several states. The defendant directed the jury's attention to the women's failure to take advantage of various opportunities to escape or call for help.

"To assist the jury in understanding the women's conduct and to dispel any notion that they voluntarily submitted" (*Winters,* at 605) to defendant, the government called a psychiatrist as expert witness. This witness testified that the women had suffered from post–traumatic stress disorder, described as a profound personality change following a period of severe psychological stress. The expert said this explained the failure of the women to attempt escape or to cry out for help in a public place. Another expert described to the jury the conditioning process that women subjected to forced prostitution go through, and how eventually only subtle threats are required to maintain control over them. The Ninth Circuit Court of Appeals agreed with the trial court that the expert testimony concerned matters beyond the common knowledge of the average layman, which would assist the jury to understand the evidence presented.

For many years, the legal assumption with regard to rape victims was that they would complain immediately to authorities. In 1949, this court explained the use of the now discredited feudal doctrine of hue and cry in sex offense cases:

> This doctrine rests on the ground that a female naturally complains promptly of offensive sex liberties upon her person and that, on trial, an offended female complainant's *omission of any showing* as to *when* she first complained raises the inference that, since there is no showing that she complained timely, it is more likely that she did not complain at all, and therefore that it is more likely that the liberties upon her person, if any, were not offensive and that consequently her present charge is fabricated. . . .
>
> Modernly, the inference affects the woman's credibility generally, and the truth of her present complaint specifically, and consequently, we permit the state to show in its case–in–chief *when* the woman first made a complaint consistent with the charge.

(Citations omitted.) *State v. Murley,* 35 Wn.2d 233, 237, 212 P.2d 801 (1949). Although the hue and cry doctrine is no longer given credence as a legal doctrine, the underlying assumption that female victims of sex offenses naturally immediately complain has long been accepted by the legal community and the lay public. *See generally* United States Comm'n on Civil Rights, *Under the Rule of Thumb: Battered Women and the Administration of Justice* (1982).

In *State v. Allery, supra,* Klingbeil testified in part to explain why a battered woman remains in a relationship that is psychologically and physically dangerous. This court stated:

> We find that expert testimony explaining why a person suffering from the battered woman syndrome would not leave her mate, would not inform police or friends, and would fear increased aggression against herself would be helpful to a jury in understanding a phenomenon not within the competence of an ordinary lay person.

*Allery,* at 597. In that case, the evidence was introduced as part of a battered woman's claim of self–defense. The trial

judge found the expert testimony useful to aid the jury's understanding of the defendant's perceptions at the time of the killing. The trial judge in the instant case found an explanation of why a battered woman would not leave or report abuse was helpful to the jury's understanding of the victim's perceptions and behavior.

In Ciskie's trial, Klingbeil testified about battered woman syndrome as a subgrouping of post–traumatic stress disorder. She used L. Walker's *The Battered Woman* as a reference and described to the jury Walker's description of the cycle theory of violence that characterizes battering relationships. In brief, the cycle has three phases. The first is a tension–building phase, during which anger builds and smaller incidents of battering may occur. The second is the acute battering phase, marked by an extremely violent attack. Following the acute phase comes the final, contrite stage, during which the batterer expresses sorrow and remorse, and promises that the violence will never recur. The cycle theory also describes severe mood and personality shifts in the batterers, consistent with the testimony of the victim and other witnesses, describing Ciskie as being sometimes friendly and pleasant, and sometimes menacing and abusive. Klingbeil also explained the denial and rationalization of the batterer's behavior that is typical of a battered woman. She testified that a common characteristic among battered women is their tendency to minimize, rationalize, or deny the abusive behavior.

> [T]he battered woman . . . most notably is very frustrated and accepts the kind of behavior that is going on, and rather than striking out tends to internalize it. This is what results in much of the stress disorder and the psychosomatic complaints. This also results in the tremendous amount of emotional dependency and the . . . clinical depression that we see with most battered women, almost universally. . . .
>
> Another characteristic is the . . . unlimited patience that these battered women have with regard to hoping. And I say that in quotes, "that everything will be all right." That is, hoping that it will go away, the battering

behavior, or the devastating situation. And they tend to . . . travel miles on all kinds of reinforcement.

. . . for instance: the batterer says that he will never do it again, or he will get a better job, and life will be okay. They tend to believe that.

Report of Proceedings, at 663.

Klingbeil explained that, although battered women are commonly thought to be low–income women married to and financially dependent upon their batterers, this is by no means a requisite element of the diagnosis. Klingbeil testified that, "[i]n fact, we know that battered women now come from all social–economic groups, all religions, all economic groups."[2] Report of Proceedings, at 662. On cross examination, Klingbeil explained that almost half the battered women encountered in the scientific literature were not married to the batterer,[3] and about half of them were self–supporting. Klingbeil testified that such women are dependent upon other people, "emotionally dependent, sometimes economically dependent." Report of Proceedings, at 694. Klingbeil testified that:

[Battered women] also tend to like the person [batterer]. The batterer generally is not battering all of the time. He's got some decent behavior, and you see this—what's known as the Dr. Jekyll and Mr. Hyde kind of personality. So for all those reasons, she tends to minimalize it. She's embarrassed, she's ashamed, she doesn't want her parents, she doesn't want her children, she doesn't want

---

[2]The popular impression that battered women are necessarily poor, and dependent upon their battering spouses, may be due to a reporting artifact. "Lower class families are more likely to gain official attention from police, hospitals, and other public agencies because they have less privacy and fewer private resources than middle and upper class families." G. Goolkasian, *Confronting Domestic Violence: A Guide for Criminal Justice Agencies* 3 (1986).

[3]Many of the other states which have admitted expert testimony on the battered woman syndrome have done so in cases where the battering victim was not married to the batterer. *State v. Anaya,* 438 A.2d 892 (Me. 1981); *Smith v. State,* 247 Ga. 612, 277 S.E.2d 678 (1981); *State v. Hill,* 287 S.C. 398, 339 S.E.2d 121 (1986); *Terry v. State,* 467 So. 2d 761 (Fla. Dist. Ct. App. 1985); *People v. Torres,* 128 Misc. 2d 129, 488 N.Y.S.2d 358 (1985).

the neighbors to know, she doesn't want her friends to know. So she hides it.

Report of Proceedings, at 694–95.

Appellant's case at trial characterized the State's case as an exaggeration of the relationship between the victim and Ciskie. The theme of Ciskie's case was that C.H. lied and embellished her story. The defense argued that her behavior was inconsistent with that of a victim of such brutality. In cross examination during the State's case, prior to the introduction of expert testimony, defense counsel asked the victim several times why she had failed to take advantage of several opportunities to break off the relationship, and why she had failed to see a doctor after the alleged attacks. Ciskie personally questioned C.H. during the defense case (despite the prosecutor's vigorous objections) and asked her, "*If I did as you—as you have said I'd done, why didn't you call the police?*" (Italics ours.) Report of Proceedings, at 821.

During closing argument, defense counsel underscored the fact that the victim never reported that she had been raped to her doctor, the police, or to other friends, as the incidents occurred. "So, when she claims to be so naive, this 55–year–old naive woman, and not really responsible for her actions during this period of time, *not capable of reporting or dealing with it the way the rest of us would, ask, is that really a sensible thing?*" (Italics ours.) Closing Arguments, at 43.

The defense challenged C.H.'s credibility and attempted to persuade the jury that her failure to leave the relationship, or to complain earlier to a doctor or police, was inconsistent with that of a rape victim. To dispel this impression, the State asked Klingbeil to express her expert opinion about C.H.'s behavior. At defense counsel's request, the question was phrased as a hypothetical case history that paralleled the evidence presented by the State. Klingbeil said that the woman in the hypothetical case history suffered from post–traumatic stress disorder. She said that the facts in the hypothetical example were consistent with

the cycle theory of violence. In Klingbeil's expert opinion, the failure of the woman in the hypothetical to report the sexual assaults until 2 days after the last incident and 9 months after the first, was characteristic of a person suffering from the battered woman syndrome. This testimony was helpful to the jury's understanding of a matter outside the competence of an ordinary lay person, and the trial court limited the admission of that testimony to its appropriate purpose.

Although Klingbeil's testimony clearly satisfied the requirements of ER 702, the trial court had the discretion under ER 403 to exclude the evidence if he found a danger of unfair prejudice. The trial court properly found that there was danger of such prejudice if Klingbeil were to present to the jury a diagnosis of C.H. as a rape victim, and accordingly barred such testimony. At one point in the trial, however, the court did permit Klingbeil's testimony that she examined C.H. and diagnosed her as suffering from post–traumatic stress disorder. This diagnosis was preceded by Klingbeil's testimony that the "stressors" that might start the process of post–traumatic stress disorder could be any unusual stressful event, not necessarily a rape or assault. The court did not allow counsel to question Klingbeil on what she believed the "stressor" to be in C.H.'s case. The jury was free to infer that the "stressor" had to do with the allegation of rape, other aspects of C.H.'s relationship with Ciskie, or another event in her life.

This aspect of Klingbeil's testimony was not necessarily helpful to the trier of fact, and if the trial court had acceded to the prosecutor's request to permit testimony that the basis of the diagnosis was a belief C.H. had been raped, it would have come perilously close to testimony we found inadmissible in *State v. Black,* 109 Wn.2d 336, 745 P.2d 12 (1987). In *Black,* this court held that a diagnosis of "rape trauma syndrome" was inadmissible for the purpose of allowing an expert opinion that a victim has been raped because such testimony lacks scientific reliability and unfairly prejudices a defendant accused of rape.

Testimony from a psychological expert on a diagnosis as to whether an alleged victim was in fact raped is troublesome because of a danger of invading the function of the trier of fact. Such testimony often amounts to a comment on the credibility of a witness. Thus, in *State v. Fitzgerald,* 39 Wn. App. 652, 694 P.2d 1117 (1985), the Court of Appeals ruled that a pediatrician who had interviewed two children who alleged that the defendant had raped them could not testify, on the basis only of those interviews, that she believed their allegations, notwithstanding her expertise in dealing with sexually abused children. Moreover, the psychological expert's opinion that the alleged crime has occurred often unfairly prejudices the defendant by "creating an aura of special reliability and trustworthiness" about the complainant's assertion she had been raped. *Black,* at 349 (quoting *State v. Saldana,* 324 N.W.2d 227, 230 (Minn. 1982)).

Here, the court properly limited Klingbeil's testimony on the diagnosis of post–traumatic stress disorder to her final diagnosis, without allowing her to indicate her assessment of C.H.'s credibility regarding whether there was a rape. With the benefit of hindsight, it would perhaps have been preferable to bar the diagnosis portion of testimony altogether, to avoid the danger of the jury's inferring a diagnosis of rape. We do not sit in the place of the trial court, however, and will not disturb a discretionary admission of expert testimony absent abuse. *State v. Petrich,* 101 Wn.2d 566, 575, 683 P.2d 173 (1984). In the context of this trial, the court did an admirable job of limiting the expert's testimony to that which would be of maximum benefit to the jury, without invading its role as judge of credibility. The court fully complied with the Rules of Evidence and the guidelines set forth in *State v. Allery,* 101 Wn.2d 591, 596, 682 P.2d 312 (1984).

## II

Ciskie also contends the trial court erred in admitting the testimony of Elaine Ciskie. C.H. testified during the State's

case in chief that on January 28, 1983, as well as on many other occasions, appellant had threatened to kill her. During the defense's case, Ciskie specifically denied threatening to kill C.H. during the January incident. He denied that she had ever appeared fearful of him at any time. For impeachment, the State offered the testimony of Elaine Ciskie, appellant's former wife. She testified that appellant had telephoned her during 1983 around his birthday, February 3, about his intent to kill C.H., using very similar threats and language to what the victim had described in the January assault.

■ The State cites *State v. Descoteaux*, 94 Wn.2d 31, 38, 614 P.2d 179 (1980), for the proposition that once a defendant has "opened the door" by testifying to his own past good behavior and denying prior acts of misconduct, the State may legitimately impeach his assertions. *See generally* J. Weinstein, *Evidence* ¶ 404[05] (1986). Appellant attempted to portray his relationship with C.H. as free from threats and intimidation. Appellant argues that Elaine Ciskie's testimony was not responsive to his testimony, because he never denied telling Elaine he was contemplating taking C.H.'s life. Appellant further alleges that he did not testify that he *never* threatened the victim's life, he simply denied making threats on the occasions alleged by the State.

Appellant's characterization of the substance of Elaine Ciskie's testimony as an unrelated act of misconduct is untenable. The telephone call was made very nearly the same time as the January incident, and the nature and substance of the threat was nearly identical to that testified to by C.H. The trial court did not err in admitting Elaine Ciskie's testimony to rebut Ciskie's.

### III

Ciskie contends the trial judge made two errors in instructing the jury. First, he argues the jury should have been instructed on "knowledge" as an implicit element of rape. As Ciskie concedes, "knowledge" is not an express

element of the Washington statute defining rape in the first, second, or third degree. RCW 9A.44.040–.060. His defense at trial to counts 3 and 4 was that the victim consented to sexual intercourse. He argues now that if he had a bona fide reasonable belief based on the circumstances at the time that C.H. voluntarily consented to engage in sex with him, he must have lacked the requisite mental state to commit rape.

The jury was instructed that to convict Ciskie, they must find beyond a reasonable doubt that "[C.H.] did not consent to sexual intercourse with the defendant *and such lack of consent was clearly expressed by words or conduct*". (Italics ours.) Report of Proceedings, at 1166. The court also instructed the jury that "Consent means that at the time of the act of sexual intercourse there are actual words or conduct indicating freely given agreement to have sexual intercourse." Report of Proceedings, at 1169. The latter instruction was phrased in the wording of RCW 9A.44-.010(6), the definitional section of the Washington sexual offenses statute. In order to convict, the jury must have found beyond a reasonable doubt C.H. clearly manifested her lack of consent to appellant. The court provided clear instructions to the jury on this issue, and Ciskie's argument is without merit.

## IV

Ciskie also assigned error to the trial court's instruction to the jury on the definition of "threat," one of the statutory elements of the crime of rape in the first and third degrees. He alleges the additional instruction placed undue emphasis on the totality of the evidence in the case regarding threats, constituting a comment by the trial court on the evidence in violation of Const. art. 4, § 16. This contention, too, lacks merit.

The trial court provided the jury with a definition of one of the elements of the crime charged—"threat"—in accordance with RCW 9A.04.110(25). An instruction which does no more than accurately state the law pertaining to an

issue in the case does not constitute an impermissible comment on the evidence by the trial judge under Const. art. 4, § 16. *Seattle v. Smiley,* 41 Wn. App. 189, 192, 702 P.2d 1206 (1985). An impermissible comment on the evidence is an indication to the jury of the judge's personal attitudes toward the merits of the cause. *State v. Foster,* 91 Wn.2d 466, 481, 589 P.2d 789 (1979). The trial judge's instruction conveyed no attitude toward the merits of the case to the jury. In fact, he instructed the jury specifically that

> The law does not permit me to comment on the evidence. I have not intentionally done so. If it appears to you that I have so commented during any of the trial or the giving of these jury instructions, you must disregard such comment entirely.

Report of Proceedings, at 1160.

## V

■ Finally, Ciskie makes numerous allegations of prosecutorial misconduct and instances of ineffective assistance of counsel. We must determine, first, whether the comments of the prosecutor were, indeed, improper. An attorney's argument may include reasonable inferences from the evidence admitted at trial, and such inferences do not constitute acts of misconduct. *State v. Hunter,* 35 Wn. App. 708, 715, 669 P.2d 489 (1983). If the comments were improper, then we must determine whether there is a substantial likelihood that the comments affected the jury.

As this court held in *State v. Reed,* 102 Wn.2d 140, 145, 684 P.2d 699 (1984), citing *State v. Latham,* 100 Wn.2d 59, 66, 667 P.2d 56 (1983), "although the Sixth Amendment and Const. art. 1, § 22 grant defendants the right to trial by an 'impartial jury', the right does not include a right to an error–free trial." We have examined each of the allegedly improper comments separately in the context of the entire record, and conclude that the prosecutor's comments, although at times heated, were reasonable inferences supported by evidence in the record, not resulting in prejudice

to the appellant. The prosecutor's conduct did not deprive Ciskie of a fair trial.

■ Likewise, an examination of the entire record in light of Ciskie's claims of incompetence reveals to us that Ciskie received effective representation from his trial counsel. The appellate test for counsel incompetence is whether, after an examination of the whole record, the court can conclude appellant received effective representation and a fair trial. *State v. Smith,* 104 Wn.2d 497, 511, 707 P.2d 1306 (1985); *State v. Johnson,* 74 Wn.2d 567, 570, 445 P.2d 726 (1968). To prevail in a claim of incompetence, appellant must also be able to make a showing that the incompetence resulted in prejudice to him or her. *State v. Cobb,* 22 Wn. App. 221, 226, 589 P.2d 297 (1978). Ciskie's allegations of ineffective assistance amount to no more than dissatisfaction with trial tactics (in which he acquiesced) which failed.

We find no error in this difficult case which was very ably conducted by the trial judge. The judgment is affirmed.

BRACHTENBACH, DOLLIVER, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., and CUNNINGHAM, J. Pro Tem., concur.

DORE, J. (dissenting)—The majority holds that the prosecution, in its case in chief, can introduce expert testimony on the battered woman syndrome when such evidence would be helpful to the jury's understanding of the victim's perceptions and behavior. The majority, however, fails to evaluate the prejudicial impact of the testimony on the defendant. In my opinion, testimony on the battered woman syndrome is inadmissible as a matter of law where it is used as an affirmative weapon against a defendant. I dissent.

## BATTERED WOMAN SYNDROME

We have not previously been faced with a case where the prosecution offered battered woman testimony as direct evidence against a defendant. In *State v. Allery,* 101 Wn.2d 591, 597, 682 P.2d 312 (1984) we held that the defendant

can offer expert testimony on the battered woman syndrome to assist in evaluating the reasonableness of force used in self–defense. *Allery,* at 597; *State v. Walker,* 40 Wn. App. 658, 664–65, 700 P.2d 1168, *review denied,* 104 Wn.2d 1012 (1985). Nothing in *Allery* suggests use of battered woman testimony as affirmative evidence to prove elements of the crime charged.

In considering a self–defense claim, the trier of fact must evaluate the claim from the defendant's point of view as conditions appeared at the time of the act. *State v. McCullum,* 98 Wn.2d 484, 488–89, 656 P.2d 1064 (1983); *State v. Wanrow,* 88 Wn.2d 221, 234–36, 559 P.2d 548 (1977). Expert testimony on the battered woman syndrome as it relates to a battered woman's state of mind is essential to the proper evaluation of a self–defense claim. *Allery,* at 597. Battered woman testimony plays no such role in a rape prosecution. The victim's state of mind is not at issue nor is proof that the defendant is a batterer or that the defendant and the victim are involved in a battering relationship.

Applying ER 702, the majority concludes that an understanding of the battered woman syndrome is beyond the competence of the average jury and therefore expert testimony explaining the syndrome is admissible in the prosecution's case. I will concede that the average jury may harbor misconceptions about battering relationships. This lack of understanding, however, is not a sufficient ground to admit expert testimony that otherwise has only limited probative value but substantial prejudicial impact on the defendant.

Expert testimony satisfying the requirements of ER 702 must also be evaluated in terms of its prejudicial impact on defendant. ER 403; *State v. Petrich,* 101 Wn.2d 566, 575, 683 P.2d 173 (1984). ER 403 recognizes that "relevance does not ensure admissibility. There remains the question of whether its value is worth what it costs." E. Cleary, *McCormick on Evidence* § 185, at 544 (3d ed. 1984). Under the circumstances of this case, I conclude that the prejudice

of the battered woman testimony to the defendant substantially outweighs any benefits.

The trial court admitted the testimony for the purpose of dispelling the impression that a delay in reporting the rapes to the police is inconsistent with the victim's assertion that she was raped. In deciding to exclude evidence on grounds of unfair prejudice, the court must consider the availability of other means to prove the fact at issue. Comment, ER 403. Here, several friends of the victim testified that the victim told them that the defendant raped her shortly after the incidents occurred. Further, the victim testified that she did not go to the police because she was afraid of the defendant's violent temper. Insofar as the expert's testimony bears on the victim's delay in reporting the attacks to the police, there was other evidence available for rebuttal purposes.

The diagnosis that the victim suffers from post–traumatic stress disorder (PTSD) and battered woman syndrome presupposes and speculates on the existence of a batterer. There being no other person involved in a relationship with the victim during the relevant time period, the testimony amounts to an opinion that the defendant is in fact a batterer. The testimony, in effect, put the defendant on trial for being a batterer.

The prosecution interjected emotionally charged and speculative evidence on the battered woman syndrome into an already emotionally charged rape trial. The testimony could have only aroused the passion and prejudice of the jury against the defendant. *See State v. Rupe,* 101 Wn.2d 664, 686, 683 P.2d 571 (1984).

The expert's testimony also vouches too much for the victim's credibility and corroborates her testimony on the critical issue of whether the defendant raped her. The rule is that evidence designed to bolster a witness' credibility is admissible only where the witness' credibility has been attacked by the opposing party. *State v. Froehlich,* 96 Wn.2d 301, 305, 635 P.2d 127 (1981).

Klingbeil testified that the victim suffered from PTSD. The record reveals that the traumatic event that triggered the disorder was the victim's claim that the defendant raped her. She also testified that the battered woman syndrome

> is a collection of behaviors or characteristics, when taken together, lead to the diagnosis of a battered woman syndrome. It has to do with the kind of relationship as evidenced by *force or coercive kinds of power that one person has over another person, without their permission; that is, against their will.*

(Italics mine.) Report of Proceedings, at 716–17. Finally, she stated that the cycle of violence that characterizes a battering relationship can be marked by sexual violence, including rape.

The diagnosis of PTSD presupposed the existence of a rape. The diagnosis of battered woman syndrome assumes that the defendant exercised force or coercive powers over the victim such that he overcame the will of the victim. This testimony directly enhances the victims' credibility on her claim that she did not consent to sexual intercourse with the defendant. As the defendant had not attacked the victim's credibility, it was error to admit the expert's testimony.

In *Petrich* we held that the prosecution can introduce expert testimony to explain a child's delay in reporting sexual abuse to rebut an inference that the victim was not abused. *Petrich,* at 575–76. *Petrich* reflects the special consideration this court accords child victims of sexual abuse and does not control here. The danger that a jury may misconstrue the actions and behavior of a child are far greater than the dangers presented when an adult testifies.

## Conclusion

In my opinion, I find as a matter of law that expert testimony on the battered woman syndrome is inadmissible in the prosecution's case. The testimony greatly prejudiced the defendant in that it labeled him as a batterer and put him in the position of having to defend himself against

such an allegation. The evidence also impermissibly corroborated the victim's credibility on the ultimate issue of whether she was raped by the defendant. The expert's testimony constitutes prejudicial error.

I would reverse the defendant's convictions and remand for a new trial.

Reconsideration denied September 12, 1988.