[No. 29693-8-III.   Division Three.   June 19, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. RYAN R. HIGGINS, *Appellant*.

*Lenell R. Nussbaum,* for appellant.

*D. Angus Lee, Prosecuting Attorney,* and *Carole L. Highland, Deputy,* for respondent.

¶1 SWEENEY, J. — An element of third degree rape requires that the State prove that the victim did not consent to the intercourse and that "such lack of consent was clearly expressed by the victim's words or conduct." RCW 9A.44-.060(1)(a). The defendant here argues that due process of law requires that the "clearly expressed" element of this crime must be from the perspective of the defendant and that the court should be required to so instruct the jury. We reject that reading of the statute as both strained and inconsistent with the purpose of RCW 9A.44.060. The defendant also contends that the trial judge's admonition to the jury that it pay special attention to some of the State's exhibits amounted to a comment on the evidence. We conclude it did not. We therefore affirm the conviction for third degree rape.

## FACTS

¶2 N.N. first met Ryan Higgins in December 2008. They had a sexual relationship. N.N. often spent the night with Mr. Higgins at his parents' house. The relationship ended briefly in early January 2010 and they got back together in March 2010. They engaged in sexual intercourse twice between March and mid-April.

¶3 On the weekend of April 17, N.N. and Mr. Higgins went camping with a group of friends in central Washington. The two drove separate cars to the campsite, with other

members of the group. The group arrived at the campsite, set up tents, made a fire, and started drinking alcohol. It is unclear exactly how much alcohol everyone consumed that evening but Mr. Higgins and N.N. were drinking.

¶4 N.N. was the first to go to bed, around midnight. She climbed into Mr. Higgins' small two-person tent and fell asleep in her own sleeping bag. She awoke about an hour later when Mr. Higgins came into the tent but soon went back to sleep. She awoke again when Mr. Higgins started rubbing her upper chest and back with his hand. She requested that he move over, moved herself closer to the tent door, and went back to sleep.

¶5 Mr. Higgins again tried to wake N.N. and began tugging on her shorts. Mr. Higgins asked N.N., " 'Do you want to?' " or " 'Can we?' " and she replied, " 'No.' " Report of Proceedings (RP) (Nov. 12, 2010) at 81. N.N. went back to sleep. Mr. Higgins eventually moved on top of N.N. and she thought he was trying to leave the tent to go to the bathroom. She scooted under him to allow him access to the tent door. Mr. Higgins then pulled N.N.'s shorts and underwear down. She said, " 'Stop. You're drunk.' " *Id.* at 82. He responded, " '[O]h, well, you're drunk too.' " *Id.* She repeated "stop" five or six times and started crying. *Id.* at 83. She struggled to get out from under his body weight. Mr. Higgins pulled his own pants down, pinned N.N.'s arms and had sexual intercourse with her.

¶6 After the intercourse, N.N. grabbed her pants and underwear and ran out to her car, where she stayed for a few hours. In the morning, N.N. and the other girls from the group drove to a nearby gas station to freshen up. The girls returned and N.N. packed her things and left.

¶7 N.N. later told a friend what had happened and the friend advised her to call the police. N.N. first corresponded with Mr. Higgins by text messages. She told Mr. Higgins

that she never wanted to see him again. Mr. Higgins responded:[1]

Mr. Higgins:  i'm an asshole. i know what you mean, i was out of control and i feel really bad about it. i don't know if its a good idea for us to hang out when i'm stupid drunk. i do stupid shit and fuck up. i feel – i really feel bad. i don't want to hurt you so I think it's a good idea if we dont hang out when i'm drinking hardm im so sorry. 'F' me. you can do better and you know it.

Mr. Higgins:  (next message) I know im taking a l-o-n-g drive. i feel like total shit. we'll see where i end up cuz i d-n-o where im goin or when im comin back.

Mr. Higgins:  (next message) me too but im tired of hurting you. im headed for spokane, i hate myself rightnow. alot. i dno if imgonna go home.

Mr. Higgins:  (next message) so what. im thinkin montana. got a 5th of whiskey and my debit card. cya later.

Mr. Higgins:  (next message) i love you and always will. im sorry i hurt you so much.

Mr. Higgins:  (next message) you know me. drunk and out of control. about to hit moses lake.

Mr. Higgins:  (next message) me too. im tired of hurting you. i cant control myself and its bad. its been fun. have a good life.

Mr. Higgins:  (next message) trust me i do. I just want you to be happy and if that means never seeing me again so be it. im trouble and i dont want that for you.

N.N.:  you basically raped me ryan.. how do you think i feel right now.

Mr. Higgins:  I know. i feel like total shit. i get out of control when im drunk and do very stupid shit. I understand your – I understand where im com-

---

[1] These text messages appear in their original, unedited form so as not to misrepresent any intended meanings.

ing from. i 'F'd' up hardcore and ill deal with the consequences whatever it may be. i just want you to be happy and its not with me so 'F' me and do better.

*Id.* at 103-05.

¶8 N.N. contacted the police and went to the hospital for a rape examination. The sexual assault nurse documented bruising on N.N.'s inner thighs and upper arms. Mr. Higgins contacted N.N. the next day via Facebook. N.N. informed Mr. Higgins of a potential restraining order and he responded that he would deal with it:

N.N.: Listen, my mom is pushing for a restraining order. And I want it. I have written my statement and I don't want this to—excuse me—fuck up your life completely. You probably won't hear from anyone for at least a month. I will bring you your jacket sometime this week to your work and leave it on your truck. But as of now you have completely ruined me. And the person I once was is gone.

Mr. Higgins: K go for it. I screwed up major and I'll deal with the consequences of my actions. The restraining order will probably keep me out of the Navy, but thats ok. I've still got a pair of your sweats and sunglasses, i'll leave em in the front seat of my truck. I'm so sorry for all of this, I'm sick to my stomach. You won't ever have to talk to me again after this is over, i'll be far away and gone for good. Have a good life.

*Id.* at 109.

¶9 Mr. Higgins's text messages were ultimately shown to the jury. The police interviewed Mr. Higgins. He denied raping N.N. and explained that he was distraught when he sent the text messages and Facebook e-mails. He believed

the intercourse was consensual. The State charged Mr. Higgins with one count of third degree rape.

¶10 The case proceeded to a jury trial. The prosecutor and a police officer read into the record portions of a transcript from a police interview of Mr. Higgins. The transcript was marked as an exhibit but not admitted into evidence. The court interrupted the prosecutor prior to questioning on the exhibit:

> THE COURT: Before you ask that I need to make something clear with the jury. This is an exhibit that will not be admitted and will not go back with you to the jury room. So I've told you before testimony will rarely, if ever, be repeated for you, so you need to be paying attention, you shouldn't rely on the fact that because this is an exhibit that you can refer back to it. This will be the same as any other testimony and you need to pay attention to it like any other testimony. It will not be an admitted exhibit that will go back with you to the jury room.

*Id.* at 40. Defense counsel objected to the comment and moved for a mistrial on the ground that the court placed an improper emphasis on the evidence. The court denied the motion but gave a curative instruction to the jury. The defense approved of the instruction:

> Earlier I tried to be of some assistance to you and advised you that the testimony will rarely, if ever, be repeated for you in referring to parts of a transcript that were testified to. I want to make it very clear that by saying that I did not mean to comment on the weight or value that you should give to that particular evidence. As I've indicated to you before, that's your job to decide what weight or value, if any, is to be given to any evidence including that. My job is only to decide upon the admissibility of evidence. It's your duty to weigh or evaluate the evidence.

*Id.* at 80.

¶11 The prosecutor later attempted to question N.N. about the text messages. The State asked to publish an illustrative display of those messages. The court ruled that

the exhibit would not go back to the jury room and informed the jury that the exhibit was for illustrative purposes only:

Well, you can go ahead and ask questions about 1 and 7, and then I'll instruct the jury about the fact that those exhibits are not going back with them either and they need to pay close attention to that because testimony will rarely, if ever, be repeated.

By saying "pay close attention" I do not mean closer attention to this than any other evidence. That would be commenting on the evidence. But I'm just letting you know that these are also exhibits that will not be going back to you. The State Constitution prohibits the trial judge from commenting on the evidence.

*Id.* at 101.

¶12 After closing arguments, the court read the jury instructions. They included this admonition:

Our state constitution prohibits a trial judge from making a comment on the evidence. It would be improper for me to express, by words or conduct, my personal opinion about the value of testimony or other evidence. I have not intentionally done this. If it appeared to you that I have indicated my personal opinion in any way, either during trial or in giving these instructions, you must disregard this entirely.

RP (Nov. 15, 2010) at 29. Jury instruction 8 contained the elements of rape in the third degree based on RCW 9A.44.060:

To convict the defendant of the crime of rape in the third degree, each of the following four elements of the crime must be proved beyond a reasonable doubt:

One, that on or about April 17th, 2010, the defendant engaged in sexual intercourse with [N.N.];

Two, that [N.N.] was not married to the defendant and that she was not in a state registered relationship with the defendant;

Three, that [N.N.] did not consent to the sexual intercourse with the defendant and such lack of consent was clearly expressed by words or conduct; and

Four, that any of these acts occurred in the state of Washington.

*Id.* at 33; Clerk's Papers (CP) at 15. The court also instructed on the definition of "consent": "Consent means that at the time of the act of sexual intercourse there are actual words or conduct indicating a freely given agreement to have sexual intercourse." RP (Nov. 15, 2010) at 32-33; CP at 13. The jury found Mr. Higgins guilty as charged.

## DISCUSSION

CLEARLY EXPRESSED

¶13 Mr. Higgins contends that RCW 9A.44.060 and specifically the term "clearly expressed" is unconstitutionally vague and ambiguous as applied here because it is unclear (and was not made clear) from whose perspective—the victim or the defendant. Mr. Higgins's essential challenge is summarized in his reply brief: The State agrees " 'clearly expressed' implies an action on the part of the victim which is communicated to the perpetrator." Br. of Resp't at 20. The State begs the question raised in this appeal: "Does the law determine this element [clearly expressed] from the view point of the person making the communication or the person intended to receive the communication?" Reply Br. of Appellant at 1. Mr. Higgins argues here on appeal that what counts is not the victim's protestations to stop but his subjective perception of her response as expressed by her words and conduct. It is a very thoughtful and imaginative argument and one that we reject.

¶14 Interpretation of a statute is a question of law that we will review de novo. *See State v. Bright*, 129 Wn.2d 257, 265, 916 P.2d 922 (1996). We give effect to the legisla-

ture's intent and give statutory terms their plain and ordinary meaning. *State v. Elgin*, 118 Wn.2d 551, 555, 825 P.2d 314 (1992); *Bright*, 129 Wn.2d at 265. We will read a statute to avoid a constitutional problem. *State v. Chester*, 133 Wn.2d 15, 21, 940 P.2d 1374 (1997). And we will ascribe a plain ordinary meaning to words in a statute. *Id.* at 22.

■ ¶15 Rape in the third degree required that the State prove,

[U]nder circumstances not constituting rape in the first or second degrees, such person engages in sexual intercourse with another person, not married to the perpetrator:

(a) Where the victim *did not consent* as defined in RCW 9A.44.010(7), to sexual intercourse with the perpetrator *and such lack of consent was clearly expressed by the victim's words or conduct.*

RCW 9A.44.060(1)(a) (emphasis added). "Consent" means that "at the time of the act of sexual intercourse or sexual contact there are actual words or conduct indicating freely given agreement to have sexual intercourse or sexual contact." RCW 9A.44.010(7). "Clearly expressed" is not defined by the statute, but "clearly" ordinarily means something asserted or observed leaving no doubt or question and "expressed" ordinarily means to make known an emotion or feeling. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 420, 803 (1993).

¶16 So, RCW 9A.44.060(1)(a) requires that the State show that (1) N.N. did not freely agree to sexual intercourse with Mr. Higgins and (2) the lack of consent was made known to Mr. Higgins by words or conduct without doubt or question. *State v. Guzman*, 119 Wn. App. 176, 185, 79 P.3d 990 (2003).

■ ¶17 Our focus, and certainly the jury's focus, is more properly on the victim's words and actions rather than Mr. Higgins's subjective assessment of what is being communicated. *State v. Walden*, 67 Wn. App. 891, 895 n.2, 841 P.2d 81 (1992). Mr. Higgins's proposed analytical approach

would, in our judgment, turn the apparent legislative concern here on its head:

> For policy reasons it makes sense that the Legislature would focus on the issue of the victim's consent, or rather lack thereof, rather than the perpetrator's subjective assessment of the situation. To do otherwise would lead to the ludicrous result that a perpetrator could be exonerated simply by arguing that he did not know the victim's expressed lack of consent was genuine or that he did not intend to have nonconsensual sexual intercourse with the victim.

*State v. Elmore*, 54 Wn. App. 54, 57 n.5, 771 P.2d 1192 (1989).

¶18  N.N. testified that Mr. Higgins raped her. Mr. Higgins, in a series of text messages, admitted as much. The victim and Mr. Higgins offered contradictory versions of what happened during the camping trip. Indeed, they are two diametrically opposed versions of what happened. And the jury accepted one and rejected the other. The jury accepted N.N.'s version of events and rejected Mr. Higgins's version. It was privileged to do just that. *State v. Cord*, 103 Wn.2d 361, 367, 693 P.2d 81 (1985).

¶19  Mr. Higgins's argument conflates thoughtful, strong, well-tailored jury arguments with those suited for a court of review. He told the jury that he reasonably understood his victim to say yes or, at least, he understood her not to object to his overtures by what she did and what she did not say and do. That was plausible jury argument given his characterization of their history. But the jury did not believe him; it was apparently convinced that his perception of her "clear expressions" was divorced from reality or at least not consistent with the evidence. Given the potential criminal liability looming for such conduct, we accept the proposition that some defendants may hear something different or hear nothing at all, and assume they were not doing anything wrong. Br. of Appellant at 28. Mr. Higgins's text messages undermine his suggestion that he misperceived what N.N. was expressing.

¶20 On the instructions and Mr. Higgins's concerns about the instructions, he had the right to argue his theory of the case—she consented or at least did not object. And the instructions easily afforded him the opportunity to do so. Both he and his lawyers show no confusion and appear to understand what "clearly expressed" meant. And the lawyer's arguments to the jury dispel any notion to the contrary:

> *This case reminds me of an old adage that actions speak louder than words. And, in fact, I would direct your attention to Instruction No. 8, and paragraph three, and that pretty much is the issue presented here, whether or not [N.N.], whether she did not consent, and such lack of consent was clearly expressed by words or conduct to Mr. Higgins.*

RP (Nov. 15, 2010) at 48 (emphasis added).

¶21 The argument suggests that the court's instructions said exactly what Mr. Higgins wanted to argue and in the way Mr. Higgins wanted to argue it. The instruction required the State to prove beyond a reasonable doubt "[t]hat [N.N.] *did not consent to sexual intercourse with the defendant and such lack of consent was clearly expressed by words or conduct.*" CP at 15 (emphasis added). Mr. Higgins now argues that the instruction was constitutionally flawed because it is ambiguous on the question of whose perception controls. Br. of Appellant at 19. And yet as we note, defense counsel made instruction 8 the centerpiece of his final summation. Moreover there was no confusion expressed by the trial judge, the jury, or, of course, the State.

¶22 Ultimately, the problem here for Mr. Higgins is not that the jury was, or could have been confused, by the term "clearly expressed" but rather that the jury simply did not believe him when he urged that her objections were not clearly expressed. The jury concluded that they were. And the jury was privileged to do that. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

¶23 Mr. Higgins offers a very narrow reading of this statute. "Clearly expressed" addresses communication. And

communication implicates both the communicator and the person with whom she is communicating. The jury must consider both sides to answer the question whether the objections here were "clearly expressed." Mr. Higgins would have us require that the jury focus only on his understanding of what N.N. was trying to communicate, so that no matter how clearly she expressed herself, he would be entitled to acquittal if he did not understand that she was objecting. That is a strained reading of these words for us and, again, one not suggested until the case came here on appeal.

¶24  At oral argument, Mr. Higgins invited us to compare the "clearly expressed" element to self-defense and impose the same burdens on the State—to show that from the *defendant's* perspective lack of consent was clearly expressed. But self-defense appropriately focuses on whether the defendant felt he was threatened—the defendant's mens rea. *State v. Acosta*, 101 Wn.2d 612, 616, 683 P.2d 1069 (1984) (self-defense negates knowledge element of second degree assault). "Clearly expressed," on the other hand, necessarily focuses on what is being communicated between two people—is it being clearly expressed by the victim, no matter what the defendant heard or wanted to hear. The analytical focus with self-defense is on the defendant's mens rea—specifically, was his intent, his purpose, in striking out to simply defend himself rather than to assault the victim. That analytical concern is not present here. The analysis here is what did the victim communicate and did she communicate it clearly. Communication is a two-way street. So, to focus on what "he understood" inappropriately focuses on only one part of the communication. That is not to discount that part of the communication but the jury is ultimately entitled to accept or reject his perception of what was expressed.

¶25  RCW 9A.44.060 is not ambiguous. And the court did not err by failing to instruct the jury that it must determine whether lack of consent was "clearly expressed" from the

perspective of the person receiving the communication because that is not the standard and the term is unambiguous. *Walden*, 67 Wn. App. at 895 n.2.

¶26 Finally, on this point, we repeat the facts presented at trial since the constitutional challenge here is necessarily "as applied." N.N. repeatedly (five or six times) told Mr. Higgins to "stop" and attempted to scoot out from under his body. She could not get free. Mr. Higgins says he did not have ample notice that he was doing anything wrong. The jury agreed that the word "no" should have been notice enough. Ultimately, the word "no" is ample notice to Mr. Higgins "that he is doing something wrong." *See* Br. of Appellant at 28.

¶27 Mr. Higgins relies on *State v. Weisberg*[2] to support his assertion that a "clearly expressed" lack of consent cannot be based solely on the victim's subjective perception of the situation. *Weisberg* is not helpful. That case involved a conviction for rape in the second degree involving forcible compulsion under RCW 9A.44.050(1)(a). "Forcible compulsion" is statutorily defined as "physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person." RCW 9A.44.010(6). The only evidence of "forcible compulsion" in *Weisberg* was an exchange between the victim and the defendant in which the victim "expressed reservations about lying down on the bed" and he told her to " 'go ahead and lay down on the bed anyway.' " *Weisberg*, 65 Wn. App. at 725. The victim testified that she was frightened, but there was no evidence that the defendant communicated a threat or his intention to cause her bodily harm. *Id.* The court held that the State needed to present evidence from which the jury could infer that the victim perceived a threat and evidence that the defendant communicated an intention to inflict physical injury in order to coerce compliance. *Id.* at 726. Here, we are dealing

[2] 65 Wn. App. 721, 829 P.2d 252 (1992).

with a different crime (third degree rape), involving a different element (consent), and a different set of facts.

¶28 Consent involves words or conduct indicating agreement. RCW 9A.44.010(7). That agreement, or lack thereof, must be assessed from the actions of the victim. *Elmore*, 54 Wn. App. at 57 n.5. It is then the jury's responsibility to determine if those actions sufficiently conveyed "yes" or "no." *Bright*, 129 Wn.2d at 272. In contrast, a finding of forcible compulsion cannot be based solely on the victim's subjective reaction to the defendant's particular conduct—there must be a causal connection between the fear and a communicated threat. *See Weisberg*, 65 Wn. App. at 726.

¶29 Again, there is ample evidence here of a clearly expressed lack of consent from N.N. The jury found that the lack of consent was made known to Mr. Higgins by words or conduct—it was clearly expressed. No further instruction was necessary; the term is easily understood.

JUDGE'S COMMENT ON THE EVIDENCE

¶30 Mr. Higgins next argues that the judge improperly drew the jury's attention to portions of the State's case and in so doing commented on the evidence. Specifically, he argues that the judge drew the jury's attention to the police testimony of what Mr. Higgins said in an interview, and the text messages he sent to N.N.

¶31 "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." CONST. art. IV, § 16. This provision prohibits a judge from "conveying to the jury his or her personal attitudes toward the merits of the case." *State v. Becker*, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997). It is a violation even if the court's personal feelings can be implied. *State v. Jacobsen*, 78 Wn.2d 491, 495, 477 P.2d 1 (1970). However, an instruction that "does no more than accurately state the law pertaining to an issue in the case does not constitute an

impermissible comment on the evidence." *State v. Ciskie*, 110 Wn.2d 263, 282-83, 751 P.2d 1165 (1988).

¶32 In *Ciskie*, the trial judge instructed the jury on the definition of "threat," one of the statutory elements of the crime of rape. *Id.* The defendant argued on appeal that the additional instruction placed undue emphasis on the totality of the evidence in the case regarding threats and amounted to an impermissible comment on the evidence. *Id.* at 282. Our Supreme Court concluded that the trial judge's instruction did not convey a personal attitude on the merits of the case to the jury; and, moreover, the judge specifically instructed the jury that

> "[t]he law does not permit me to comment on the evidence. I have not intentionally done so. If it appears to you that I have so commented during any of the trial or the giving of these jury instructions, you must disregard such comment entirely."

*Id.* at 283.

¶33 Like the judge in *Ciskie*, the judge here conveyed no attitude toward the merits of the case when he provided the jury with a simple informational instruction that certain exhibits would not be available for review during deliberations. The jurors were told in part that "[t]his will be the same as any other testimony and you need to pay attention to it like any other testimony. It will not be an admitted exhibit that will go back with you to the jury room." RP (Nov. 12, 2010) at 40. The judge then issued a curative instruction: "I want to make it very clear that by saying that [previous instruction] I did not mean to comment on the weight or value that you should give to that particular evidence." *Id.* at 80. The judge again cautioned the jury to pay attention to evidence presented by the State that would not be admitted, but emphasized that he was not commenting on the evidence:

> By saying "pay close attention" I do not mean closer attention to this than any other evidence. That would be commenting on the evidence. But I'm just letting you know that these are also

exhibits that will not be going back to you. The State Constitution prohibits the trial judge from commenting on the evidence.

*Id.* at 101. The judge also read jury instruction 1 at the close of the case, which specifically stated, "If it appeared to you that I have indicated my personal opinion in any way, either during trial or in giving these instructions, you must disregard this entirely." RP (Nov. 15, 2010) at 29.

¶34 We affirm the conviction.

KORSMO, C.J., and BROWN, J., concur.

Reconsideration denied August 9, 2012.

Review denied at 176 Wn.2d 1012 (2013).