*The Court of Appeals*
of the
*State of Washington*
*Seattle*

RICHARD D. JOHNSON,
*Court Administrator/Clerk*

DIVISION I
One Union Square
600 University Street
98101-4170
(206) 464-7750
TDD: (206) 587-5505

November 16, 2015

Andrew Edward Alsdorf
Snohomish County Prosecutors' Office
3000 Rockefeller Ave
Everett, WA 98201-4046
aalsdorf@snoco.org

Seth Aaron Fine
Attorney at Law
Snohomish Co Pros Ofc
3000 Rockefeller Ave
Everett, WA 98201-4060
sfine@snoco.org

Maureen Marie Cyr
Washington Appellate Project
1511 3rd Ave Ste 701
Seattle, WA 98101-3647
maureen@washapp.org

Prosecuting Attorney Snohomish
Snohomish County Prosecuting Attorney
3000 Rockefeller Ave   M/S 504
Everett, WA 98201

Washington Appellate Project
1511 Third Avenue
Suite 701
Seattle, WA 98101
wapofficemail@washapp.org

CASE #: 71547-0-I
State of Washington, Respondent v. Shane Jackson, Appellant

Snohomish County, Cause No. 13-1-01658-8

Counsel:

Enclosed is a copy of the opinion filed in the above-referenced appeal which states in part:

"Affirmed, in part. Remanded for the judgment and sentence to be amended consistent with this opinion."

Counsel may file a motion for reconsideration within 20 days of filing this opinion pursuant to RAP 12.4(b). If counsel does not wish to file a motion for reconsideration but does wish to seek review by the Supreme Court, RAP 13.4(a) provides that if no motion for reconsideration is made, a petition for review must be filed in this court within 30 days.

In accordance with RAP 14.4(a), a claim for costs by the prevailing party must be supported by a cost bill filed and served within ten days after the filing of this opinion, or claim for costs will be deemed waived.

Should counsel desire the opinion to be published by the Reporter of Decisions, a motion to publish should be served and filed within 20 days of the date of filing the opinion, as provided by RAP 12.3 (e).

Sincerely,

Richard D. Johnson
Court Administrator/Clerk

jh

Enclosure

c:    The Honorable Michael T. Downes
      Shane Allen Jackson


## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON, )
                                  )      DIVISION ONE

          Respondent,    )

                                  )      No. 71547-0-I

             v.           )

                                  )      UNPUBLISHED OPINION

SHANE ALLEN JACKSON, )

                                  )

          Appellant.     )      FILED: November 16, 2015

                                  )

DWYER, J. — Following a jury trial, Shane Jackson was convicted of rape in the third degree. On appeal, Jackson contends (1) that insufficient evidence supports his conviction, (2) that the community custody condition requiring him to participate in substance abuse treatment as directed by the Department of Corrections (DOC) is invalid, and (3) that the community custody condition requiring him to "consent" to searches of his home by the DOC is facially unconstitutional. We affirm Jackson's conviction but remand for the judgment and sentence to be amended consistent with this opinion.

I

On August 24, 2012, Jackson asked S.D. to dinner at his house. S.D. asked her friend, A.M., to accompany her. Prior to this, A.M. had only met Jackson once. The plan was for A.M. and S.D. to play video games while Jackson made dinner. Since they would be drinking alcohol, S.D. and A.M. planned to sleep on the couch. A.M. was 20 years old at the time.

S.D. drove A.M. to Jackson's house. While Jackson prepared dinner, S.D. and A.M. drank mixed drinks. By the end of the night, the three of them had consumed two fifths of hard liquor. Jackson did not drink as much as S.D. and A.M.

After dinner, A.M. and S.D. were drunk. S.D. got sick and vomited in the bathroom. While A.M. was comforting S.D., Jackson came in and started rubbing A.M.'s back. A.M. "shoved" his hand off of her. When S.D. was done "being sick," A.M. and Jackson helped her to Jackson's bedroom, where she passed out on the floor. After situating S.D. in the bedroom, A.M. went to clean the dishes.

Later, while A.M. was checking the house to make sure things were in proper order,[1] Jackson approached her in the laundry room. Jackson put his arm around A.M.'s waist, pulled her in toward him, and tried to kiss her. She pushed him away and said, "No. What are you doing?" Jackson persisted, and A.M. decided to allow him to kiss her. She later explained her decision thusly: "It's very weird to be in a position where someone much larger than you is trying to hold you and is trying to force you into kissing them. And I tried to be okay with the idea. . . . I was hoping he was just doing a drunken thing and was going to give up on the whole kissing thing." Jackson then lifted A.M. up onto the washing machine and tried to remove her shorts. A.M. pushed his hand away, said, "No, don't." She jumped off the washing machine and pushed Jackson away. He stumbled back, and she said, "I'm sorry. But, no."

---

[1] Jackson, S.D., and A.M. had made a bonfire earlier, and A.M. was particularly concerned with making sure that it had been properly extinguished.

Despite A.M. telling him "no," Jackson again lifted her up onto the washing machine. This time, he removed her shorts and underwear in "one fell swoop." He pushed her back, spread her legs and "fitted his hips" between her legs. As Jackson leaned down to attempt oral sex on her, A.M. crunched up, clamped her legs together, and said, "No, stop. Just don't." Jackson asked why. She replied, "I don't want to." He then asked, "Why not?" This time A.M. said, "No. Thank you, though. I'm sorry." Jackson said, "Okay, just kissing." He tried to kiss her again. A.M. felt uncomfortable so, after several seconds, she stopped him, saying, "I'm really sorry but I just want to go to bed. I'm dizzy."

Jackson told A.M. to stay there and he would be right back. He then left the laundry room. A.M. did not wait but, instead, put her underwear and shorts back on and left the laundry room. She saw Jackson in the hallway, told him that she needed to lay down, and asked him where she was sleeping. Jackson grabbed A.M.'s elbow, placed his hand on her back, and took her to his brother's bedroom. A.M. thought she was going to be able to lie down and go to sleep. A.M. lay down on the bed. Jackson took off his shirt and knelt down on the bed next to her. A.M. asked Jackson what he was doing. He replied, "Just kissing you."

Jackson removed A.M.'s shorts. A.M. said, "No, don't." Jackson asked "Why not?" A.M. did not think that she had to give him an answer, but she replied, "No, please don't." Jackson grabbed her knees, put his mouth on her vulva, and attempted to perform cunnilingus. A.M. said, "No. Just stop." Jackson persisted. A.M. then pushed his head and said, "No. You're not even

doing it right." A.M. later explained that "[she] was so dizzy at that point, [she] just wanted him to stop. . . . [She] was angry and [she] figured that maybe if [she] tried to hurt his male ego, he would just give up." Jackson replied, "I love that you're trying to tell me what to do." A.M. said, "No, you just suck at this, and I don't want you to." She crossed her legs and turned to the side.

Jackson sat up, pulled A.M.'s legs around his waist, bumped his hips against her pelvis and said, "I just want you so bad." A.M. replied, "I'm sorry but no." Jackson asked, "Why not?" She replied, "I don't want you to." Jackson again asked, "Why not?" A.M. then replied, "I'm not even on birth control. I'm not going to get pregnant. No." Jackson told her that she could not get pregnant from the first time. A.M. said, "That's just stupid." Jackson said, "Okay, fine," patted her on the leg, and left the bedroom. A.M. thought she would finally be able to go to sleep.

Jackson came back into the bedroom and got on the bed. A.M. asked him what he was doing. Jackson showed her that he had placed a condom on his penis. Jackson then pushed the blanket away, grabbed A.M. by her knees, and forced his penis into her vagina. A.M. instantly felt excruciating pain, like she was being torn apart.[2] She pushed herself up on her elbows, scooted back on the bed and said, "Ow, ow, ow. Stop." Jackson's response to A.M.'s exclamation of pain was, "God, you're so fucking tight." He placed her legs over his shoulders and continued thrusting. When asked how she felt in that moment, A.M. explained, "It was really overwhelming. . . . I just felt completely defeated

---

[2] A.M. was examined by Sealja Puvogel, a Sexual Assault Forensic Nurse Examiner, on August 30, 2012. Puvogel observed a tear in A.M.'s fossa navicularis. According to Puvogel, "[A] tear to the fossa navicularis would be very uncomfortable."

because everything that I had done up to that point to kind of placate him without angering him and just trying not to let it happen was just over."

Jackson moved A.M.'s legs back around his waist and she again told him that his forcible penetrations were hurting her. He asked why. She said, "[b]ecause this is like sandpaper. It's just dry." Jackson then reached over, grabbed something from the window sill, and said, "I have lube." A.M. told Jackson that she did not feel well. He asked her what was wrong and she said, "This hurts and I think I'm going to throw up." A.M. removed her legs from Jackson's shoulder, tossed them to her left, and laid on her side. Jackson continued thrusting. A.M. attempted to get up by straightening her legs, rolling onto her front side, and pushing herself up onto her hands and knees. At that point, she got dizzy and her vision went black. As a result, she "slumped" back on her knees and her head "collapsed" in her hands. Jackson grabbed her waist and pulled her up saying, "Hey, hey, hey. Stay awake. Stay up here." A.M. collapsed on the bed. (At trial, A.M. was asked whether, at that moment, she had considered physically fighting Jackson in order to get away from him.[3] A.M. replied, "I did but I was very drunk. There was not a lot of strength going on. And a long time ago I remember being told that if something bad like that was going to happen to me that if I felt like they could overpower me that I shouldn't anger them or hit them because they might hit back.")

Jackson then flipped A.M. onto her back and raised one of her legs in the air. A.M. later remembered thinking in that moment, "I [can]'t do this anymore."

---

[3] "Did you think about physically fighting [Jackson], just giving it everything you had physically to get out of that room?"

She became angry and asked Jackson, "Do you have a whiskey dick or something?" Jackson replied, "Oh, I wasn't going to finish." A.M. then said, "Get off of me," and Jackson moved away from her on the bed.

A.M. went to get S.D. so that they could leave, but she could not awaken her. Jackson pulled A.M. onto the bed with him and told her to just go to sleep. A.M. could not sleep and went to the bathroom. When she tried to use the toilet, she felt "a gush of blood." The sight of "all the blood" made A.M., who already felt sick, vomit. When she was done, A.M. went back to again try to awaken S.D. S.D. would not wake up, so A.M. ended up lying on the floor next to her.

As a result of these events, Jackson was charged with rape in the third degree. The jury found him guilty as charged. Jackson was sentenced to 20 months of confinement, followed by 36 months of community custody. The court imposed 25 conditions of community custody.

II

Jackson first contends that insufficient evidence supports the jury's verdict of guilt. This is so, he asserts, because the State did not establish that A.M. "clearly expressed," by her words or conduct, her lack of consent to sexual intercourse with Jackson, as required to sustain a conviction. His contention is unavailing.

The due process clauses of the federal and state constitutions require that the government prove every element of a crime beyond a reasonable doubt. Apprendi v. New Jersey, 530 U.S. 466, 476-77, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000); U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3. "[T]he critical

inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319.

"The purpose of this standard of review is to ensure that the trial court fact finder 'rationally appl[ied]' the constitutional standard required by the due process clause of the Fourteenth Amendment, which allows for conviction of a criminal offense only upon proof beyond a reasonable doubt." State v. Rattana Keo Phuong, 174 Wn. App. 494, 502, 299 P.3d 37 (2013) (alteration in original) (quoting Jackson, 443 U.S. at 317-18), review denied, 182 Wn.2d 1022 (2015). This standard of review is also designed to ensure that the fact finder at trial reached the "subjective state of near certitude of the guilt of the accused," as required by the Fourteenth Amendment's proof beyond a reasonable doubt standard. Jackson, 443 U.S. at 315.

A claim of evidentiary insufficiency admits the truth of the State's evidence and all reasonable inferences from that evidence. State v. Kintz, 169 Wn.2d 537, 551, 238 P.3d 470 (2010). Circumstantial evidence and direct evidence can be equally reliable. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We defer to the jury on questions of conflicting testimony, credibility of witnesses,

and the persuasiveness of the evidence. State v. Killingsworth, 166 Wn. App. 283, 287, 269 P.3d 1064 (2012).

In order to convict Jackson of rape in the third degree, the jury was required to find that "[A.M.] did not consent . . . to sexual intercourse with [Jackson] and such lack of consent was clearly expressed by [A.M.'s] words or conduct." RCW 9A.44.060. "'Consent' means that at the time of the act of sexual intercourse or sexual contact there are actual words or conduct indicating freely given agreement to have sexual intercourse or sexual contact." RCW 9A.44.010(7). "'Clearly expressed' is not defined by the statute, but 'clearly' ordinarily means something asserted or observed leaving no doubt or question and 'expressed' ordinarily means to make known an emotion or feeling." State v. Higgins, 168 Wn. App. 845, 854, 278 P.3d 693 (2012) (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 420, 803 (1993)). In determining whether a lack of consent was "clearly expressed," the focus is properly on the victim's words and actions rather than a defendant's subjective assessment of what is being communicated. Higgins, 168 Wn. App. at 854.

Herein, A.M. told Jackson at least 15 times that she did not want to engage in sexual intercourse with him: (1) When he tried to remove her shorts, she pushed his hand away and said, "No, don't." (2) After she pushed him away from her, she said, "I'm sorry. But no." (3) When he first forcibly put his mouth on her vulva, she clamped her legs together and said, "No, stop. Just don't." (4) When he asked her why, she said, "I don't want to." (5) When he again asked why not, she said "No. Thank you, though." (6) When he tried to kiss her again,

she said, "I'm really sorry but I *just* want to go to bed." (Emphasis added.) (7) When he started removing her underpants, she said, "No, don't." (8) When he again asked why not, she said "No, please don't." (9) When he again tried to put his mouth on her vulva, she said, "No. Just stop." (10) When he nonetheless continued, she pushed his head and said, "No. You're not even doing it right." (11) When he said that he loved her telling him what to do, she crossed her legs and said, "No, . . . I don't want you to." (12) When he bumped his hips against her pelvis, she said, "I'm sorry but no." (13) When he asked why not, she said, 'I don't want you to." (14) When he again asked why not, she said, "I'm not going to get pregnant. No." (15) When he forced his penis into her vagina, she said, "Ow, ow, ow. Stop," and pushed herself away from him. It is clear from this evidentiary recitation that the State presented not just sufficient—but overwhelming—evidence that A.M. clearly expressed her lack of consent to engage in sexual intercourse with Jackson.

Jackson nevertheless contends to the contrary, asserting that A.M.'s words and conduct were ambiguous with regard to whether she was consenting to sexual intercourse. However, when viewed in the light most favorable to the State—as the federal and state constitutions require—the specific statements to which Jackson points, in claiming ambiguity, actually support the State's position. A.M.'s statements to Jackson that he was not "doing it right" and that he "just suck[s] at this" when he forced oral sex on her, her statement that it was "like sandpaper" when Jackson forced his penis into her vagina, and her repeated statements that Jackson's actions were hurting her, particularly when combined

with A.M.'s many statements that she did not want to have sexual contact with Jackson, support the jury's finding that A.M. expressed her lack of consent with clarity.

III

Jackson next contends that a community custody condition requiring him to participate in DOC-directed substance abuse treatment is invalid. This is so, he asserts, because the condition is not related to the crime of which he was convicted. We disagree but remand for clarification that the condition applies to treatment for alcohol only.

A trial court's authority to impose sentencing conditions is derived wholly from statute. State v. Bahl, 164 Wn.2d 739, 753, 193 P.3d 678 (2008). A condition of community custody requiring the offender to participate in alcohol or drug treatment must be "crime-related." RCW 9.94A.703(3)(c); State v. Jones, 118 Wn. App. 199, 207-08, 76 P.3d 258 (2003); State v. Parramore, 53 Wn. App. 527, 529, 768 P.2d 530 (1989). A "crime-related prohibition" is one that "directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10). To justify such a condition, the evidence must show and the court must find that alcohol or drugs contributed to the crime. Jones, 118 Wn. App. at 203, 208.

Sentencing conditions are reviewed for abuse of discretion. In re Pers. Restraint of Rainey, 168 Wn.2d 367, 374, 229 P.3d 686 (2010). A sentencing court abuses its discretion in imposing a condition if it applies the wrong legal standard. Rainey, 168 Wn.2d at 375.

The trial court herein ordered that Jackson "[p]articipate in substance abuse treatment as directed by the [DOC]," as a condition of community custody.

The evidence adduced at trial showed that, on the night that he raped A.M., Jackson supplied alcohol to A.M., notwithstanding that she was under the legal drinking age, and himself consumed alcohol. At sentencing, in explaining its decision, the trial court repeatedly referenced the involvement of alcohol in Jackson's commission of the crime. Thus, Jackson's contention that there was no evidence showing that alcohol contributed to his offense is without merit.

However, as the State concedes, Jackson's parallel contention that there was no evidence showing that drugs were involved in the crime is correct. Because, unlike several other conditions considered by the trial court, the challenged condition is not explicitly limited to alcohol but refers, generally, to "substance[s]," there is ambiguity regarding its application. Therefore, we remand the cause to the trial court to amend the judgment and sentence to indicate that the challenged condition applies only to alcohol abuse treatment.[4]

IV

Jackson's final contention is that the community custody condition requiring him to "consent" to certain searches of his residence by DOC is facially unconstitutional.[5]

---

[4] The State contends that this is the warranted remedy. We agree.
[5] The condition at issue herein provided:
You must consent to DOC home visits to monitor your compliance with supervision. Home visits include access for the purposes of visual inspection of all areas of the residence in which you live or have exclusive/joint control/access.

Our Supreme Court recently addressed a facial constitutional challenge to a substantially similar community custody condition. See State v. Cates, 183 Wn.2d 531, 354 P.3d 832 (2015).[6] Therein, the court held that "[f]urther factual development [was] needed" before the challenge was ripe for review, and "[the defendant] [did] not face a significant risk of hardship by [the court] declining to review the merits in the absence of developed facts." Cates, 183 Wn.2d at 536.

The Cates decision controls our analysis. Therefore, we hold that the challenge presented is not ripe for review.

Affirmed, in part. Remanded for the judgment and sentence to be amended consistent with this opinion.

We concur:

---

[6] The condition at issue in Cates added, "to also include computers which you have access to" at the end. 183 Wn.2d at 533. This difference is of no moment to our analysis.