IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | No. 32694-2-III |
| | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| CHRISTOPHER OWENS. | ) | |
| | ) | |

LAWRENCE-BERREY, A.C.J. — After an initial mistrial, a second jury convicted

Christopher Owens of first degree murder. This court affirmed his conviction in his

direct appeal. He then filed this personal restraint petition (PRP), alleging his second

attorney provided ineffective assistance for numerous reasons, including failure to

consult a domestic violence expert and interview certain lay witnesses. We agree and do

not review Mr. Owens's other bases for alleged ineffective assistance of counsel because

the bases we rely on are adequate to establish sufficient prejudice. We therefore grant

Mr. Owens's PRP, reverse his conviction, and remand for a new trial.

FACTS

A.    *First and Second Trials*

Richard Tyler and Christopher Owens's mother, Kellie Brown, had been in a

relationship and living together in Ms. Brown's home since late 2002. Mr. Tyler had

always been a bully, but his behavior escalated in 2008. That year, he pushed Ms. Brown

down a flight of stairs. The couple ended their relationship later that year.

In December 2008, the two had an argument over the telephone and, in response,

Ms. Brown obtained a domestic violence protection order. Mr. Tyler had been out of

town for months, but Ms. Brown knew he would return by airplane on December 23. Ms.

Brown delivered Mr. Tyler's dog to Mr. Tyler's relatives and made arrangements to

transfer Mr. Tyler's property to them. Ms. Brown and Mr. Owens packed Mr. Tyler's

possessions into his truck, which was at Ms. Brown's house. Ms. Brown talked to police

about serving Mr. Tyler with the protection order when he arrived at the airport. She also

asked her son to be at her house on December 23 to protect her.

On December 23, 2008, Ms. Brown and Mr. Tyler spoke on the phone. Among

other things, he said he was coming to get "what's his." 5 Report of Proceedings (RP)

(May 26, 2011) at 674. Ms. Brown told him that she had a protection order and that he

was unwelcome at her house. Later, Mr. Tyler's father and sister picked up Mr. Tyler at

the airport. They went to the Department of Licensing so Mr. Tyler could renew his

license tabs, but he did not have his vehicle registration. They drove Mr. Tyler to Ms.

Brown's house to get the vehicle registration.

Mr. Tyler entered Ms. Brown's garage through the overhead garage door. He then

entered the house through a door between the garage and the basement. Ms. Brown

dialed 911 and reported that Mr. Tyler was breaking into her house. As Mr. Tyler walked

up the stairs leading to a landing in this split level house, Mr. Owens shot him in the face

2

using a .410 shotgun. Unknown to Mr. Owens, this shot was fatal. Mr. Owens then retrieved his .22 rifle from the living room area. Mr. Owens then aimed his rifle down into the stairwell and shot Mr. Tyler in the back of the head.

Police arrived shortly after and saw Mr. Tyler's dead body lying face down on the stairs connecting the basement and foyer. Mr. Owens admitted that he shot Mr. Tyler. Detective Darin Darnell interviewed Mr. Owens later that day. Mr. Owens said that Mr. Tyler came to the house and began shaking the front door. He then heard noise from the garage door, which he believed his mother had jammed shut somehow. Mr. Owens walked halfway down the stairs between the main floor living room and the foyer. He warned Mr. Tyler not to come up the stairs and that he had a gun. Mr. Owens did not know whether Mr. Tyler heard the warning or saw the gun. Mr. Tyler did not respond and continued up the stairs between the basement and the foyer. Mr. Owens then shot Mr. Tyler from his perch on the upper stairs.

Mr. Owens told police he did not know whether Mr. Tyler would have assaulted his mother. He said he felt threatened because Mr. Tyler had been told there was a protection order but came into the house and did not stop. Mr. Owens also told the police that he had little firsthand information about his mother's relationship with Mr. Tyler, and that he had never seen Mr. Tyler assault his mother.

The State charged Mr. Owens with first degree murder or, in the alternative, second degree murder. His first attorney was replaced by a second attorney early in the case. The parties initially tried the case in 2009. Mr. Owens argued he acted in self-

3

defense. That trial resulted in a hung jury. The second trial occurred in 2011. Mr. Owens argued he acted in defense of himself and his mother.

Mr. Owens testified he saw changes in Mr. Tyler around 2008. Mr. Tyler became unpredictable and would "blow up." 5 RP (May 26, 2011) at 665. Mr. Owens testified he never saw Mr. Tyler assault his mother but he did witness Mr. Tyler bully and intimidate her. He believed that Mr. Tyler had pushed his mother down the front steps of her home. He also was generally fearful that Mr. Tyler might sexually assault his mother. He testified that when Mr. Tyler got into his mother's house on December 23, he was afraid for himself and his mother.

There were also statements in Mr. Owens's interview with Detective Darnell that tended to support Mr. Owens's theory of self-defense. Mr. Owens explained that he brought his gun to Ms. Brown's house because he did not want to get into a "physical fight" with Mr. Tyler. 3 RP (May 25, 2011) at 418. He said that Mr. Tyler was six inches taller than him. He repeatedly told Detective Darnell he did not want Mr. Tyler to beat him up or his mother.

Ms. Brown testified on her son's behalf. She testified generally that she feared Mr. Tyler, Mr. Tyler had threatened her in front of her son, Mr. Tyler assaulted her in February 2008, and he threatened to sexually assault her in December 2008.

The second jury rejected Mr. Owens's defense and found him guilty of first degree murder. The court sentenced him to 321 months in prison. In his direct appeal, Mr. Owens argued instructional error, evidentiary error, and prosecutorial misconduct. *State*

4

*v. Owens*, noted at 173 Wn. App. 1017, 2013 WL 593476, *review denied*, 178 Wn.2d 1006. He did not raise ineffective assistance claims. This court rejected his arguments and affirmed his conviction. After the Washington Supreme Court denied review, Mr. Owens filed this PRP. Because the PRP had legal merit, it was referred to a panel of this court for a decision on the merits.

B.   *Evidence Submitted in the PRP*

Mr. Owens's first court-appointed attorney requested funds for a psychological evaluation to consider the impact of domestic violence for the defense. The motion was based on Mr. Owens's statements to the police that he had witnessed his mother being abused through his childhood and that these memories were part of the reason he shot Mr. Tyler. The court authorized the funds. Mr. Owens's second court-appointed attorney, however, failed to have the evaluation conducted. He informed his client that the prosecutor could use an evaluation to paint Mr. Owens as having violent tendencies.

Counsel for Mr. Owens in this PRP retained April Gerlock, PhD, to conduct a domestic violence evaluation. Dr. Gerlock, an expert on domestic violence, evaluated Mr. Owens in the context of his relationship with his mother, his childhood, and the facts of this case. Dr. Gerlock is an advanced practice psychiatric nurse practitioner with 35 years' experience working with individuals with posttraumatic stress disorder (PTSD), other mental health disorders, and abuse victims and perpetrators. She has worked with hundreds of men court ordered for domestic violence rehabilitation and hundreds of victims of domestic violence. She has been a consultant for the Battered Women's

5

Justice Project for over five years and worked as a principal investigator of a research study investigating intimate partner violence perpetration among PTSD treatment-seeking veterans. She has provided testimony for both the prosecution and defense.

Dr. Gerlock's report indicates that Mr. Owens spent his childhood trying to protect his mother from abuse by her boyfriends. Mr. Owens's father left the family when Mr. Owens was about three years old. His mother struggled to provide for him and his brother. She met "Mark" when Mr. Owens was about four or five years old. Mark helped provide for them. At some point in the relationship, Mark broke into their home, coming in through the garage and up from the basement. He beat up Ms. Brown in the bathroom. Mr. Owens could hear noise and his mother screaming. On another occasion, he remembered his mother screaming for help and asking him to call 911. He was too young to know how to call 911. Another time, Mark broke through their back door. He heard his mother screaming for help and believed Mark was sexually attacking his mother. On another occasion, he watched Mark throw his mother down. When Mr. Owens and his brother went to her, she could not talk, she was just crying. Mr. Owens reported that the police came when they were called, but they never arrived in time to prevent the violence. Dr. Gerlock concluded that "[e]vents that took place during his mother's relationship with Mark had a major impact on [Mr. Owens]." Decl. of Dr. April Gerlock at 3.

By the time he was nine years old, his mother had broken up with Mark and married "John" to get away from Mark. John would talk about having his ex-wife killed.

6

This had an impact on Mr. Owens. Ms. Brown then met Mr. Tyler at her high school reunion. Mr. Tyler's ex-wife, "Dawn," warned Ms. Brown that Mr. Tyler was dangerous. Initially, Ms. Brown and Mr. Owens did not believe the allegations and dismissed them as the rantings of an angry ex-wife. During this time, Ms. Brown was paying Mr. Tyler's legal bills for his assaults on Dawn and violations of protection orders. Mr. Owens was aware of the content of the protection orders because his mother would show them to him.

Over time, Mr. Owens began to observe Mr. Tyler's increasingly hostile and aggressive behavior toward himself and Ms. Brown. After Mr. Tyler broke his leg, Mr. Owens saw Mr. Tyler yell at Ms. Brown if she did not allow him to exceed his pain medications. In another incident, Mr. Owens borrowed some movies from his mother's home, mistakenly believing they were hers. He was at his own home when Mr. Tyler showed up unannounced. Mr. Tyler knocked things off Mr. Owens's shelf and yelled, "'Don't ever take my stuff again.'" Decl. of Gerlock at 6. Mr. Owens also reported that his mother could not get rid of Mr. Tyler. They would break up, but he would return. He would call her a bitch and threaten to sue her parents over his broken leg. As Mr. Tyler became increasingly verbally and physically abusive, Mr. Owens and his mother no longer viewed Dawn as an angry ex-wife.

Dr. Gerlock explained the dynamics of domestic violence:

> The best way to understand domestic violence dynamics is to understand that it is a pattern of coercive and assaultive behaviors that are on-going and happen both over the period of time that two people are in an

7

intimate relationship and frequently even beyond the time that they have terminated the relationship, or during the periods of time when the relationship is on-and-off. In domestic violence there have been one or more incidents of physical and or sexual violence. *The threat that physical or sexual violence could happen again, at any time, is highly believable by the victim.*

*. . . Sometimes the reminder of the possibility of violence is enough.* Other patterned behaviors on the part of the abuser reinforce this reminder with something as simple as a look to tactics of psychological abuse and terror. These psychological tactics take the form of making threats, acts of intimidation, emotional abuse, isolation, minimization, denial and blame . . . use of children, male privilege and economic abuse . . . .

Decl. of Gerlock at 15 (emphasis added).

Dr. Gerlock then listed examples of various categories of abuse, including physical violence that involved Mr. Tyler knocking Ms. Brown down some steps, which injured her wrist, and Mr. Owens's awareness of Dawn's allegations that Mr. Tyler had strangled her. The report also noted Mr. Owens's and his mother's awareness that: (1) Mr. Tyler threatened to kill Dawn, (2) Mr. Tyler's statement to Ms. Brown that he "'should have killed that fucking bitch [Dawn] when [he] had a chance,'" (3) Mr. Tyler's threat to kill Mr. Owens's dog, (4) Mr. Tyler's abuse of the dog and its attempts to flee Mr. Tyler, (5) Mr. Tyler's frequent outbursts, (6) Mr. Tyler's violations of protection orders obtained by his ex-wife, (7) Mr. Tyler's banging on the door late at night, throwing objects at the door, and then laughing when Ms. Brown expressed fright, (8) Mr. Tyler belittling Mr. Owens at work, calling Mr. Owens's and his mother's work place and yelling and screaming at her, and (9) coming to Ms. Brown's home on the night

8

of December 23, despite her repeatedly telling him not to come to her home. Decl. of Gerlock at 16.

Other behaviors included (1) threatening Ms. Brown with sexual assault, (2) stating that she better put out when he returned and that "'he'd better get some p[ ],'" (3) Dawn telling Ms. Brown that "'[Mr. Tyler's] a loose cannon . . . he's going to get a gun and kill you,'" (4) Mr. Tyler entering Mr. Owens's house without knocking, then knocking his things off the shelf and yelling at him, (5) following Ms. Brown into the house when she tried to call the police and yelling, "'Do it fucking bitch . . . do it.'" Decl. of Gerlock at 16.

Dr. Gerlock then described *"Elements of Danger"* in domestic violence cases, noting that lethal violence is associated with a domestic violence victim's attempt to leave the relationship or exercise autonomy. Decl. of Gerlock at 17. Dr. Gerlock identified the elements that contributed to Mr. Owens's and his mother's belief that danger was not only possible, but likely. These included (1) Mr. Tyler's history of violent behavior toward family members, acquaintances, and strangers; (2) his history of physical, sexual, or emotional abuse toward intimate partners; (3) estrangement or recent separation; (4) presence of life stressors for Mr. Tyler, including unemployment and financial problems; (5) his obsessive jealousy; (6) Mr. Owens's and his mother's belief that Mr. Tyler had been drinking at the airport prior to his flight home; (7) their awareness that Mr. Tyler had attempted lethal violence in the past; (8) their awareness that Mr. Tyler had violated prior protection orders and stated that no piece of paper would

9

stop him; (9) their fear that he was coming over to rape her (based on his statement that Ms. Brown better "'put out'" and that he wanted some "'p[ ]'" when he arrived; and (10) the prior failure of the system to respond adequately to domestic violence situations. Decl. of Gerlock at 19-20.

After reviewing the trial testimony, Dr. Gerlock identified the numerous steps Mr. Owens and his mother took to protect themselves, including (1) Mr. Owens changing the locks at his mother's house, (2) Ms. Brown informing people about her fear of Mr. Tyler, including his family, (3) obtaining a protection order, (4) telling others about the protection order, (5) trying to reach the police officer who knew about the protection order, and (6) locking her doors on the day of Mr. Tyler's return.[1]

Dr. Gerlock wrote, "[d]espite these actions, Mr. Tyler did come over. Despite knowing that there was a [protection order] pending being served, his family accompanied him to her home. Despite the changed locks, and locked door, Mr. Tyler did not knock or ring the doorbell. Despite the garage being secured, Mr. Tyler was able to wrench the garage door open, break through the fire door, and gain entry into her home." Decl. of Gerlock at 21-22.

---

[1] The dissent characterizes Mr. Owens's shooting of Mr. Tyler as "an execution." Dissent at 2. It is for the trier of fact to determine whether these several steps taken to prevent Mr. Tyler from entering the house and Mr. Owens's shouted warning to Mr. Tyler was "an execution." A jury could reasonably find that Mr. Tyler's decision to ignore the protection order and to break into Ms. Brown's house was for the purpose of assaulting her. Because RCW 26.50.110(4) and (5) make an assault in violation of a protection order a felony, a jury could find that Mr. Owens was both subjectively and objectively justified in using lethal force to protect his mother. RCW 9A.16.050(1).

Dr. Gerlock admits that Mr. Tyler's intentions were unknown, but that Mr. Owens's and his mother's past experiences with abuse likely caused them to be hyper aware of dangerous situations. She explained that domestic violence studies and literature show that trauma survivors, such as battered women or a child witnessing violence in the home, develop the ability to recognize danger from even nuanced behavioral cues of the abuser. They recognize aggression from the first violation of personal boundaries. She explained, "[w]ith each additional violation, the perception of danger increases. *Within the context of domestic violence, this heightened perception of danger is reasonable.*" Decl. of Gerlock at 22 (emphasis added). She continued,

> Both Ms. [Brown] and Mr. Owens had experienced a known abuser breaking into their home and assaulting Ms. [Brown]. They knew how quickly situations escalated and how dangerous they could become. They also knew that police were not able to respond quickly to enough to prevent an assault, and that in the past, they had to rely on each other for protection. Both had experienced Mr. Tyler's threats of violence, angry outbursts, and refusal to respect the boundaries they established for their own safety.
> . . . .
> Not only did Mr. Owens feel afraid and threatened by the unfolding situation and what they feared might happen, but he had witnessed and responded to violence towards his mother numerous times in the past. As a child he described helplessness in being unable to help his mother. As a man, he was determined to protect her.

Decl. of Gerlock at 22.

Dr. Gerlock emphasized that Mr. Owens and Ms. Brown were close and that Mr. Owens was very aware of Mr. Tyler's abusive actions toward his mother. He was also attuned to her fear. Dr. Gerlock reported that in the days leading up to December 23, Mr. Owens was aware of how violent Mr. Tyler could be, knew Mr. Tyler had no regard for

11

protection orders, knew Mr. Tyler had made threats to kill his former wife and used lethal force against her, and knew his mother was very fearful of Mr. Tyler.

Dr. Gerlock emphasized that Mr. Owens's and his mother's experiences with domestic violence victimization were additional elements contributing to their fear of Mr. Tyler on the night in question. Ms. Brown had been severely beaten on several occasions. A prior intimate partner had broken into their home and assaulted her. And, they had experienced on more than one occasion that police often arrived too late.

Dr. Gerlock ultimately concluded, "Mr. Owens' belief that he needed to engage in self-defense behaviors was a reasonable response to the escalating situation leading up to and on the afternoon of December 23, 2008." Decl. of Gerlock at 23. She stated, "[h]is fear that Mr. Tyler m[ight] physically or sexually assault or kill his mother is also reasonable based on his awareness of Mr. Tyler's prior behaviors and bold actions in ignoring Ms. [Brown's] clear message that he was not to come over and was not to come in her home. Mr. Owens shared his mother's terror and described that fear and terror to the responding detective. He felt so afraid that he told Detective Darnell that he was relieved to be in police presence." Decl. of Gerlock at 23.

Mr. Owens also attached the declarations of expert and lay witnesses to show that great force had been used to open the garage doors. Bruce Schneller, a code compliance inspector for more than 33 years, went to Ms. Brown's home the day after the shooting to help Ms. Brown's father clean the stairwell where Mr. Tyler had been shot. He stated

that his professional experience trained him to make careful observations. He described the following:

> I entered the house through the metal garage door. It was closed at the time. I had to maneuver it carefully to open because the sheet metal on it was actually bent. I could clearly see the garage door had been forced home. It looked as if someone had tried to pull the door upward, and when it wouldn't go, they forced it open. It took a lot of effort to get through that door to have it cause that much damage. It had to have made a lot of noise.

Decl. of Bruce Schneller at 2.

Mr. Schneller noticed sheetrock dust on the floor of the garage and that the door jamb on the door between the garage and the living space was freshly splintered. He saw a foot print on the door that looked like it was made from sheetrock dust. He stated, "[t]he fresh damage I witnessed on the metal door and wooden door indicated to me a great deal of force and violence had been used to enter this residence. I concluded it must have been a very frightening experience for anyone inside." Decl. of Schneller at 3. He stated that neither the defense nor the police contacted him about the case.

Jordan Jaspers, who lived across the street from Ms. Brown, submitted a declaration. He recalled getting home from school around 3:00 p.m. on the day of the shooting. He stated that Ms. Brown's garage door was closed when he got home. He stated that he played catch in the street with a friend for a while, but was not outside when Mr. Tyler arrived at Ms. Brown's house.

Winthrop Taylor, a police officer for 33 years and a licensed private investigator since 2004, reviewed defense counsel's file. He stated that the file did not contain any

13

evidence that counsel had interviewed Ms. Brown's neighbors, her coworkers, or relatives. Mr. Taylor interviewed Brandon Troxler, Ms. Brown's next door neighbor. Mr. Troxler reported that Ms. Brown had asked him to keep an eye out for Mr. Tyler because she had a protection order against him. Mr. Troxler stated that he left his house about 3:45 p.m. the day of the shooting. He stated he believed he would have noticed if her garage door had been open then.

Mr. Owens also submitted affidavits from witnesses who could have testified that Ms. Owens was terrified of Mr. Tyler on the day she obtained the protection order and that Mr. Tyler had serious anger and aggression problems. The declaration of Emerrae M. Alohr, an advocate based counselor at a domestic violence crisis center, shows that Ms. Brown feared sexual assault from Mr. Tyler. Ms. Alohr described Ms. Brown coming to the center in 2008 "visibly shaking with fear and crying while she talked to me." Decl. of Emerrae Alohr at 1. She stated,

> Ms. Brown told me she was very afraid of Rick Tyler. He was coming back from being on the road. She had changed the locks on the door to her home. She had told him she changed them, but he said he was coming regardless. He had told her he wanted sex. Kellie wanted to end the relationship. She said Rick would not take "no" for an answer. He told her they would be together no matter what.

Decl. of Alohr at 1-2.

Finally, Mr. Owens attached the declarations of people who could testify about Mr. Tyler's volatility and aggressiveness. Daniel Howard provided a statement that Mr. Tyler harassed him while Mr. Tyler was working as a flagger during the summer of 2008.

14

According to Mr. Howard, Mr. Tyler would curse him and his aggression toward Mr. Howard escalated. He wrote: "[Mr. Tyler] used language clearly trying to incite a fight and even threatening violence. He obviously had an anger control problem." Decl. of Daniel Howard at 3. At one point, Mr. Tyler pointed to Mr. Howard's home and threatened, "I know where you work. I know where you live and I know your home." Decl. of Howard at 3. Mr. Howard called the sheriff's office. Later, Mr. Howard saw a picture of Mr. Tyler in a Wenatchee newspaper and learned he had been killed while violating a protection order. Mr. Howard concluded, "My experience with Mr. Tyler was he was a violent, threatening person who demonstrated an anger control problem. . . . I thought if I saw him coming up to my property, based on my experiences with him, I might have been in the same position as this person who shot him." Decl. of Howard at 4. Mr. Howard contacted Mr. Owens's defense attorney, but never heard back.

Sean Ford submitted an declaration stating that he met Mr. Owens, Ms. Brown, and Mr. Tyler when he worked at the Wenatchee Collision Center. According to Mr. Ford, the collision center was owned by Ms. Brown's father, and Ms. Brown and Mr. Owens both worked there. Mr. Ford stated that Mr. Tyler did not work at the collision center, but that he often brought his own car to work on and would move collision center work out of the way. Mr. Ford stated that at one point, Mr. Tyler became angry with Mr. Ford and vandalized his car. Mr. Ford feared Mr. Tyler. He stated: "I absolutely did not want to get into a physical altercation with Rick Tyler. I was afraid to go outside with

my three-year old daughter. I believed he would assault me if I did. I phoned the police because he had vandalized my car." Decl. of Sean Ford at 2.

C.     *Evidence from the Reference Hearing*

This court granted oral argument. Following oral argument, this court ordered a reference hearing to answer several questions. These questions were formulated so the answers would assist this court in determining whether Mr. Owens's second attorney was deficient for not consulting a domestic violence expert witness.

The reference hearing occurred in Douglas County Superior Court. During the hearing, Paul Cassel, Mr. Owens's first attorney, testified that after his initial investigation, he requested funds for a psychiatric expert, Dr. Mark Mays. He explained, "it was apparent to me that the defense, or at least a defense of the case would be defense of others, and, and given what occurred, what [Mr. Owens] did, prompted me to seek assistance from an expert who could help explain what he did, either for purposes of plea bargaining or for trial preparation." RP (May 18, 2016) at 36-37.

John Crowley was Mr. Owens's second attorney and began representation prior to the first trial. He testified he had never worked with a domestic violence expert and viewed domestic violence as limited to physical violence. He did not view domestic violence as a significant piece of the case and, therefore, did not consult an expert about the effects of domestic violence. He also testified he did not discuss the case with Mr. Cassel. As to Mr. Crowley's decision not to use an expert, he testified, "I didn't make a decision. It didn't—*I didn't ever go down that path* is what happened." RP (May 18,

16

2016) at 60 (emphasis added).

The trial court entered findings in response to our questions set forth in the reference hearing order: It found that Mr. Crowley was aware of court funding for a psychiatric expert, did not communicate with prior counsel or Dr. Mays about the case, was negligent for failing to inquire about Mr. Cassel's request for a psychiatric evaluation, and failed to consult any expert regarding the effects of domestic violence for purposes of the case, including any self-defense claim. In further response to our questions, the trial court found that Mr. Crowley was negligent for failing to go through *any* thought process for considering expert witness assistance in view of the significant amount of information that warranted such assistance.

The court summarized its findings:

Mr. Crowley demonstrates a clear lack of understanding and experience regarding domestic violence at the time of the two trials; yet extensive information was available including case authority. His lack of professionalism by not communicating with prior counsel, even a courtesy contact, or proceeding forward with the court's authorization for evaluation demonstrates a clear disregard as to the obligations and commitment to a zealous defense of the Petitioner, Chris Owens. His answers to the Court of Appeals' inquiries shows a clear lack of knowledge and understanding of domestic violence and its effects upon those who have experienced and witnessed the same during their lives.

Reference Hr'g Findings of Fact, *In re Pers. Restraint of Owens*, No. 16-2-00066-2, at 9 (Douglas County Super. Ct., Wash. June 13, 2016).

17

ANALYSIS

Mr. Owens asserts that multiple instances of ineffective assistance of counsel deprived him of a fair trial, including failure of defense counsel to adequately investigate the case, present exculpatory evidence, request a proper self-defense instruction, interview and/or call certain expert and lay witnesses, and to object to the State's alleged improper closing argument.

To obtain relief on collateral review based on constitutional error, the petitioner must demonstrate by a preponderance of the evidence that he was actually and substantially prejudiced by the error. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 671-72, 101 P.3d 1 (2004). "[I]f a personal restraint petitioner makes a successful ineffective assistance of counsel claim, he has necessarily met his burden to show actual and substantial prejudice." *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012). To prevail on an ineffective assistance claim, a petitioner must prove that (1) counsel's performance was deficient and (2) the petitioner was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

As to the first requirement, the petitioner must show counsel's performance fell below "an objective standard of reasonableness." *Id.* at 688. Reasonable tactical choices do not constitute deficient performance. *Id.* at 689. But strategic decisions are entitled to deference only if made after an adequate investigation of law or facts or are supported by reasonable professional judgments. *Id.* at 690-91; *see also State v. Maurice*, 79 Wn. App.

18

544, 552, 903 P.2d 514 (1995). Reviewing courts must make "every effort to eliminate the distorting effects of hindsight." *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 888, 828 P.2d 1086 (1992).

As to the second requirement, the petitioner must show by a "reasonable probability"—by less than a more likely than not standard—that but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

*Failure to Consult a Domestic Violence Expert*

We first address Mr. Owens's claim that defense counsel should have consulted a domestic violence expert. He maintains that a domestic violence expert was necessary to assist the jurors in understanding the reasonableness of Mr. Owens's fears because jurors do not always understand the dynamics of domestic violence.

Generally, "the decision whether to call a witness is a matter of legitimate trial tactics and will not support a claim of ineffective assistance of counsel." *Maurice*, 79 Wn. App. at 552. The presumption of counsel's competence, however, can be overcome by showing a failure to adequately investigate or subpoena necessary witnesses. *Id.*

Multiple cases have held that mental disorders and specifically battered person syndrome are beyond the ordinary understanding of laypersons. *See, e.g., State v. Janes*, 121 Wn.2d 220, 236, 850 P.2d 495 (1993); *State v. Ciskie*, 110 Wn.2d 263, 273-74, 751

19

P.2d 1165 (1988); *State v. Allery*, 101 Wn.2d 591, 597, 682 P.2d 312 (1984). In *Allery,*

our Supreme Court stated:

> We find that expert testimony explaining why a person suffering from
> battered woman syndrome would not leave her mate, . . . and would fear
> increased aggression against herself would be helpful to a jury in
> understanding a phenomenon not within the competence of an ordinary lay
> person. . . . This evidence may have a substantial bearing on the woman's
> perceptions and behavior at the time of the killing and is central to her
> claim of self-defense.
>     . . . It is appropriate that the jury be given a professional
> explanation of the battering syndrome and its effects on the woman through
> the use of expert testimony.

*Allery*, 101 Wn.2d at 597. The court has also applied this reasoning to expert testimony

regarding battered children:

> [T]he same reasons that rendered evidence of the battered woman
> syndrome helpful to the jury in a self-defense case again apply with equal
> force to the battered child evidence. Expert testimony regarding the
> syndrome helps the jury to understand the reasonableness of the
> defendant's perceptions:
>
>     . . . .
> . . . The jury can then use such knowledge to determine whether the
> defendant's belief that he was in imminent danger of serious bodily injury
> or loss of life was reasonable under the circumstances.

*Janes*, 121 Wn.2d at 236.

In this case, the first appointed defense attorney recognized the need for a mental

health expert on domestic violence. He requested, and the court authorized, funds for an

expert. Substituted defense counsel, however, rejected the use of an expert, expressing

concern that the prosecutor could potentially use the report to show that Mr. Owens had

violent tendencies.

20

We can find no reasonable strategic purpose in rejecting the use of a domestic violence expert. First, there was no risk in consulting with such an expert. Counsel's consultations are protected by the work product privilege. If Mr. Owens's trial counsel ultimately chose not to present a mental defense, the consultation and evaluation would have remained privileged. *Cf. State v. Pawlyk*, 115 Wn.2d 457, 800 P.2d 338 (1990).

*Deficient Performance*

Trial counsel's performance is deficient if it falls below a minimum objective standard of reasonableness. *State v. Benn*, 120 Wn.2d 631, 663, 845 P.2d 289 (1993). Competent counsel has a duty to reasonably investigate. *In re Pers. Restraint of Brett*, 142 Wn.2d 868, 873, 16 P.3d 601 (2001). The presumption of counsel's competence can be overcome by showing a failure to investigate: "'Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts and introduction of expert evidence.'" *Hinton v. Alabama*, 134 S. Ct. 1081, 1088, 188 L. Ed. 2d 1 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 106, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)). Courts defer to a trial lawyer's decision against calling witnesses if that lawyer investigated the case and made an *informed* and reasonable decision against conducting a particular interview or calling a particular witness. *State v. Jones*, 183 Wn.2d 327, 340, 352 P.3d 776 (2015). "But courts will not defer to trial counsel's uniformed or unreasonable failure to interview a witness." *Id.*

Following the reference hearing, the trial court found that Mr. Crowley's failure to consult a psychiatric expert was deficient performance. The facts support this finding.

21

Mr. Crowley had prior counsel's file, which contained Mr. Cassel's request to hire a psychiatric expert and the court order authorizing funds for an expert. Mr. Crowley gave no reason as to why he did not discuss this information with prior counsel, apart from stating that his routine practice is to send referring attorneys a simple thank you note. He also offered no explanation as to why he did not interview a psychological expert in view of the discovery, except to say that he was totally unfamiliar with the application of domestic violence in self-defense cases.

The trial court also found that Mr. Crowley failed to research relevant case law. A routine search would have revealed case law that supports the admission of expert testimony to assist jurors in understanding mental issues. In the end, when asked at the reference hearing how he concluded an expert was not necessary, Mr. Crowley stated, "**I didn't make any conclusion whatsoever**. I didn't really go through that thought process." Reference Hr'g Findings of Fact at 5.

Although the decision to call a witness is generally a matter of trial strategy, the presumption of counsel's competence can be overcome by showing a failure to adequately investigate or subpoena necessary witnesses. *Maurice*, 79 Wn. App. at 552. Reasonably competent counsel could have anticipated that the State would argue and try to prove that Mr. Owens did not reasonably fear that his mother would be raped, seriously injured, or killed by Mr. Tyler. Mr. Cassel stated that after reviewing the initial discovery, including Mr. Owens's statement to law enforcement after the incident, it was clear to him that a psychological expert was necessary to the defense. He stated, "[t]here

22

was abundant evidence that [Mr. Owens] had witnessed domestic violence against his mother through his childhood, and the memories of those events contributed to his belief that he needed to defend his mother and himself the night of the shooting." Decl. of Paul Cassel at 2. Mr. Cassel stated it was immediately apparent to him that the defense would be defense of self and another, and that the only issue at trial would be the reasonableness of Mr. Owens's perceptions and actions. Mr. Cassel believed that the assistance of a domestic violence expert was crucial to the defense.

Failure to interview a particular witness can constitute deficient performance. *Jones*, 183 Wn.2d at 340; *see also Jones v. Wood*, 114 F.3d 1002, 1010-12 (9th Cir. 1997) (failure to investigate witnesses called to the attention of trial counsel as important constitutes ineffectiveness). Mr. Crowley was aware that prior counsel had consulted Dr. Mays, a forensic psychologist, for help in assessing the potential domestic violence dynamics of the case. *See* Pet'r's Ex. 2 ("DEFENSE REQUEST FOR FUNDS TO HIRE A PSYCHIATRIC EXPERT"). In that request, Mr. Cassel stated: "The undersigned believes that that relationship between the past and current events should be examined by a qualified psychologist to give an opinion at the time of trial that may assist the jury in determining whether or not self defense applies in this case." *Id.* Mr. Crowley's investigation was deficient for failing to follow through with this information.

Finally, Mr. Crowley's failure to consult a domestic violence expert cannot be attributed to strategic decision-making as he did not investigate the issue at all. An uninformed decision is not a strategic one. The trial court's strong findings following the

23

reference hearing are critical to our disposition of this PRP. Notably, the trial court found that defense counsel performed deficiently by not consulting a domestic violence expert. To pass off defense counsel's deficient performance as a reasonable strategic decision, as argued by the dissent, would improperly make appellate judges finders of fact and usurp the trial court's role in the reference hearing.

*Prejudice*

A domestic violence expert was key to helping the jury assess Mr. Owens's perceptions of Mr. Tyler's behaviors on the afternoon of the homicide. The fundamental issue at trial was the reasonableness of Mr. Owens's perceptions of danger. It is difficult to conceive of most laypersons accepting a defense argument that Mr. Owens's use of lethal force was reasonable without support from an expert on the effects of long-term domestic violence. According to Dr. Gerlock, the memories of that abuse, detailed above, contributed to his belief that lethal force was necessary to defend his mother and himself the afternoon of the homicide.

Without a domestic violence expert, the defense could not effectively respond to the State's case. During closing, the State minimized Mr. Owens's and his mother's fears, arguing, "to suggest that the defendant and his mother are victims in this case, you gotta be kidding." 6 RP (May 27, 2011) at 779. The State also argued that their fears were unreasonable and "not rooted in any facts." 6 RP (May 27, 2011) at 784. The State minimized "domestic violence" as mere "buzz words" and argued, "why would you use those terms, you know, domestic violence? I suggest to you, ladies and gentlemen, there

24

isn't any real history of domestic violence. . . . I'll stand here and suggest to you the evidence doesn't establish, the facts don't establish that Richard Tyler was a violent person." 6 RP (May 27, 2011) at 787.

In response to this PRP, the State argues the facts are insufficient to even warrant a self-defense instruction. Dr. Gerlock's report undermines the State's argument. In her expert opinion, threats of physical or sexual violence are highly believable to victims of domestic violence such as Mr. Owens. Because he had witnessed violent behavior against his mother, Mr. Owens developed the ability to recognize danger from even nuanced cues of the abuser. Each of Mr. Tyler's past violent behaviors of which Mr. Owens was aware increased his perception of danger. Dr. Gerlock noted that Mr. Owens was aware of Mr. Tyler's threats to kill his ex-wife, Mr. Tyler's threat to sexually assault his mother, Mr. Tyler's pushing his mother down some stairs, and Mr. Tyler's statement that he would disregard the protection order. Also, Mr. Owens witnessed his mother's fear. He helped her change her locks and he knew she had obtained a protection order against Mr. Tyler. Dr. Gerlock's opinions would explain why Mr. Owens would not go to his mother's house on December 23 without a gun.

Without the assistance of a domestic violence expert, defense counsel could not effectively rebut the State's argument. Dr. Gerlock's testimony would have supported Mr. Owens's contention that he believed his mother was in grave danger. Given that self-defense/defense of others was *the* issue in the case, there is a reasonable probability

25

of a different outcome had Dr. Gerlock testified. This deficiency alone warrants

reversal.[2]

*Failure to Investigate and Obtain Lay Witnesses*

Next, Mr. Owens contends that his second attorney was deficient for failing to

interview and obtain lay witnesses who corroborated his and Ms. Brown's perceptions of

Mr. Tyler's dangerousness. He argues that at least two other people had complained of

Mr. Tyler's behaviors and that if "they reasonably perceived Mr. Tyler as a threat, [Mr.

Owens's and Ms. Brown's] perceptions were also reasonable." Br. in Support of

Personal Restraint Pet. at 68. He also contends that defense counsel should have called

neighbors who could have testified that the garage door was closed on the afternoon of

December 23, called Mr. Schneller, who observed the damage to the garage doors, as

well as a witness who observed Ms. Brown's fears just before she obtained a protection

order against Mr. Tyler.

Trial counsel has a duty to investigate the case, which includes witness interviews.

*Jones*, 183 Wn.2d at 339. "We can certainly defer to a trial lawyer's decision against

---

[2] The State asserts that Mr. Owens's arguable right to use deadly force terminated after the first shot when the danger ceased. But as previously noted, Mr. Owens did not know that the first shot was fatal. A rational trier of fact might find that Mr. Owens acted reasonably in defense of himself and his mother.

In addition, the parties did not sufficiently brief the evidentiary issues discussed in footnotes 2 and 3 of the dissent. There may be facts, nuances, and arguments not foreseen by us that have significant importance in an ER 403 analysis. For these reasons, it is improper for us to address these evidentiary issues and the trial court has full authority to make its own evidentiary rulings.

calling witnesses if that lawyer investigated the case and made an *informed* and reasonable decision against conducting a particular interview or calling a particular witness." *Id.* at 340.

Defense counsel failed to investigate and interview several people, including Mr. Jaspers and Mr. Schneller. Mr. Owens argues that the testimony of these potential witnesses would have corroborated his and his mother's testimonies that the garage door was closed on the day of the homicide. The State responds that whether the garage door was closed when Mr. Tyler arrived is not a material issue.

We can find no reason for counsel's failure to interview Mr. Jaspers and Mr. Schneller. Reasonably competent counsel would have called witnesses who could have testified that the garage door was closed and that the garage doors were freshly damaged. Although Mr. Jaspers did not observe the garage door at the exact time that Mr. Tyler arrived at Ms. Brown's home on December 23, Mr. Jaspers noticed that it was closed at 3:00 p.m. when he got home from school and remained closed until he went inside after playing catch with a friend. Moreover, the day after the shooting, Mr. Schneller saw fresh damage to both the exterior and interior garage doors.

Contrary to the State's contention, whether the garage door was open is a significant fact. Mr. Tyler's alleged use of force to break through two locked doors would have certainly escalated Mr. Owens's and Ms. Brown's fears of danger. The testimony of these witnesses would have shored up the reasonableness of Mr. Owens's and Ms. Brown's fears on the day of the shooting and undermined Mr. Tyler's father's

27

testimony that the garage door was open. As indicated, we can only defer to a trial

lawyer's decision against calling witnesses if that lawyer investigated the case and made

an informed decision against conducting a particular interview or calling a particular

witness.

Here, reasonably competent counsel would have interviewed Ms. Brown's

neighbors and Mr. Schneller. We cannot defer to trial counsel's *uninformed* decision not

to call witnesses. "'[S]trategic choices made after less than complete investigation are

reasonable precisely to the extent that reasonable professional judgments support the

limitations on investigation.'" *Jones*, 183 Wn.2d at 340 (alteration in original) (quoting

*Strickland*, 466 U.S. at 690-91). Defense counsel's failure to adequately investigate was

deficient performance.

As to the question of prejudice, it is difficult to say whether defense counsel's

failure to call these two witnesses affected the outcome of the trial.

*Cumulative Ineffective Assistance of Counsel*

Mr. Owens argues that these alleged instances of ineffective assistance, taken

together, cumulatively deprived him of a fair trial. The cumulative effects of errors may

require reversal, even if each error on its own would otherwise be considered harmless.

*State v. Coe*, 101 Wn.2d 772, 789, 684 P.2d 668 (1984).

We determine that the failure to consult and have a domestic violence expert

testify in this case provides a sufficient basis alone to reverse, given the amount of

domestic violence evidence in this case. The first jury was deadlocked on the issue of

28

whether the homicide was justified. If a jury had the assistance of an expert such as Dr.

Gerlock to understand the dynamics of domestic violence in this case, there is a

reasonable probability that the outcome of the trial would have been different. Defense

counsel's other noted deficiencies of not interviewing Ms. Brown's neighbors and calling

them and Mr. Schneller to testify compounded this prejudice. We conclude the

cumulative effects of defense counsel's deficiencies deprived Mr. Owens of a fair trial.

We therefore grant Mr. Owens's PRP, reverse his conviction, and remand this matter for

a new trial.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

Lawrence-Berrey, A.C.J.

I CONCUR:

Siddoway, J.

29

32694-2-III

KORSMO, J. (dissenting) —

> There are countless ways to provide effective assistance in any given case.
> Even the best criminal defense attorneys would not defend a particular
> client in the same way.

*Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Christopher Owens brought this personal restraint petition (PRP) arguing, in essence, that his trial counsel, John Crowley, did not investigate and try this self-defense/defense of others case in the same manner that the original attorney, Paul Cassel, expected to do. Owens needed to do more than that. He had to show that Crowley's defense of this case was so significantly below professional standards that confidence in the verdict was undermined. *Id.* at 694. He failed to make that showing here. Because he cannot show that he actually was prejudiced by trial counsel's performance, Owens is not entitled to relief. Additionally, he cannot demonstrate that self-defense was even available under these facts.

The victim, Richard Tyler, returned to the home he shared with Mr. Owens' mother, Kelly Brown, after a several month absence. Rather than respond to his demands for entry, Owens and Brown pretended no one was home. Owens took up an ambush position and, when Tyler entered the dwelling through the door from the garage, mortally

wounded the unarmed man with a blast to the face from a .410 shotgun. Owens then

went to another room, retrieved his .22 rifle, walked back to the prostrate man, and used

the rifle to complete the task of destroying Mr. Tyler's brain by delivering a shot to the

back of the head. This was an execution.

On these facts, it was quite remarkable that the court instructed on self-

defense/defense of others. Accordingly, I give Mr. Crowley great credit for persuading

the trial court to give those instructions. And, contrary to the suggestions of the PRP, Mr.

Crowley clearly was aware of the bulk of the evidence that the petitioner now claims he

should have investigated.[1] In response to the prosecutor's effort to preclude a self-

defense instruction at the first trial, Mr. Crowley detailed Ms. Brown's victimization by a

boyfriend when Mr. Owens was six and how that incident (attempted rape) affected the

youth. Clerk's Papers (CP) at 10-11. Since Owens and Tyler had worked together,

Owens was familiar with Tyler's temper and his anger issues, as well as the victim's

abuse of Oxycontin and alcohol. Owens and his mother both had been victims of Tyler's

bullying, and they had observed him bully others. CP at 11-14. Crowley used all of this

---

[1] The majority opinion also indicates that Crowley had this knowledge when it cites Owens as stating that Crowley feared the prosecutor would use the evaluation against him by painting him as having violent tendencies. Majority at 5; *see State v. Mohamed*, 186 Wn.2d 235, 375 P.3d 1068 (2016). This declaration establishes that Crowley had a strategic reason for not pursing domestic violence expertise since it would shift the focus from Tyler's violent behavior to the behavior of his client.

information to successfully convince the judge that a self-defense instruction was justified. CP at 14-16.

Despite this success, Owens now claims that Crowley should have sought out a domestic violence expert to bolster the reasonableness of his and Brown's fears of Tyler. For three reasons, I think this would have been error. For one thing, testimony concerning how and why Owens and Brown processed information differently than those who have not had lifelong associations with domestic violence was secondary to their direct awareness of Tyler's temper from working with him and being the victim of the man's bullying. The why of that awareness added little to the existing evidence.

Secondly, the primary beneficiary of this testimony would have been the prosecution since it would provide a motive for the murder. According to Dr. April Gerlock's proposed testimony, Owens long had been frustrated by his inability to protect his mother from her dysfunctional relationships. This evidence would help the jury understand why Owens took advantage of the situation to execute Tyler. From a self-defense standpoint, blowing a dying man's head apart makes no sense. However, viewing the actions as an opportunity to fulfill a lifelong desire to protect a mother he had failed in the past, the murder is easily portrayed as violent vengeance, achieved at last. Explaining how Owens was maladjusted due to his upbringing did not aid the defense.

Thirdly, but primarily, the problem with this argument is that it misses the real issue here. The question was not what Mr. Owens perceived or the reasonableness of that

3

perception. Rather, it was the objective reasonableness of his actions that actually was the contested point at trial. There was ample evidence that Mr. Owens and his mother feared that Tyler might act violently. Having an expert come in to testify why they had learned to fear him added very little to the picture already before the jury.[2] What the defense lacked was any legitimate justification for shooting an unarmed man in the first place, let alone applying the coup de grace to one who obviously was no threat to anyone.[3] In addition to having a subjective fear of Tyler, the defense also had to show that the defendant acted in an objectively reasonable manner. *E.g.*, *State v. Walker*, 136 Wn.2d 767, 772-773, 966 P.2d 883 (1998). While the defense understandably argues the subjective fear prong in this court, it utterly lacks support for the objective reasonableness prong. It needed to establish both.

---

[2] Not all of the history of Brown's difficult relationships is likely to be admitted at a retrial. To the extent it holds any relevance, only the history materials known to Owens would be of value to the jury. Ms. Brown was not on trial and her perceptions of Mr. Tyler simply were not relevant. It seems likely that much of this material would be excluded at trial. ER 403.

[3] Strangely, the majority excuses the fatal, second shot on the basis that Mr. Tyler was going to die from the first wound anyway. This totally misses the point. Owens was charged with murder, and the final shot was the killing blow. The defendant does not get to parcel out his conduct into (allegedly) justified and unjustified behavior and thereby claim a defense to the whole from an alleged justification for part of his actions. It is still murder to kill a dying man. Even at that, Owens has presented no objective argument for the need to ambush Tyler with the first shot, and he has absolutely no legal justification for the fatal shot. This court cannot simply ignore the critical flaw in Owens' defense.

4

All the PRP establishes is a different way of doing something that trial counsel already successfully accomplished—convincing the judge that he had presented a sufficient case to obtain a self-defense/defense of others instruction. Since trial counsel already succeeded on this issue, it is very difficult to comprehend how counsel allegedly erred here. But even if there was error in failing to discover and use expert testimony as supplemental evidence for the self-defense theory, Mr. Owens simply has not established that he was prejudiced. All the majority can point to is the fact that the prosecutor argued against the defense argument that Owens and Brown were the true victims in the case due to their past experience with Tyler's violence. The prosecutor could make the same argument in a retrial of this case, just as in any other case where the defense attempts to change the focus of the jury inquiry by arguing that the roles of offender and victim should be reversed. The crime charged here was the murder of Richard Tyler. He was the victim. That he had allegedly victimized Brown in the past was relevant to the perceived need to use force in this instance, but it did not in the least change the roles of the parties, let alone provide justification for the use of lethal force.[4]

---

[4] Dr. Gerlock is not a use of force expert. Her testimony, if used at a new trial, would (as the majority correctly recognizes) properly focus on what the jury members might not understand—the subjective reasonableness of Owens' perceptions about the need to use force. However, as ably explained in *Walker*, those perceptions are not relevant to the objective reasonableness inquiry the jury would also have to address. 136 Wn.2d at 772-773.

5

This situation is analogous to the recent decision in *In re Pers. Restraint of Caldellis*, __ Wn.2d __, 385 P.3d 135 (2016). The primary issue there was whether the pattern instruction for first degree murder by extreme indifference, WPIC 26.06, correctly stated the law since it included an additional element not stated in the statute. *Id.* at 140-142. The court concluded that the extra element contained in the WPIC was not necessary. *Id.* at 142. The court then turned to the question of whether defense counsel provided ineffective assistance by (1) not asking for the WPIC version with its additional element and (2) failing to request a self-defense instruction on the murder charge even though the defense had successfully sought self-defense on two assault charges. The first allegation failed because the instruction given was correct and did not prevent the defense from arguing its theory of the case. *Id.*. The second allegation of ineffective assistance also failed despite defense trial counsel's admission that there was no tactical reason not to seek the instruction. The defense had successfully obtained and argued excusable homicide instructions to the jury. *Id.* at 143. Because of the successful advocacy for the excusable homicide defense, counsel did not render deficient performance. *Id.* at 144.

As defense counsel did in *Caldellis*, here attorney Crowley successfully obtained, and ably argued, self-defense to the juries that heard these two trials. The current claim is merely an additional path to the same goal—presenting a theory of self-defense to the jury. Owens has failed to demonstrate that Crowley erred here, let alone prejudicially so,

6

because Crowley obtained and argued the very same instruction that Owens claims he should have used.

The fact that another route existed to the same goal does not render the path chosen by Mr. Crowley deficient as a matter of law. As noted in the beginning of this dissent, the existence of another way to try the case does not satisfy the commands of *Strickland* in the least. 466 U.S. at 689. It also is appropriate to conclude with more from that same *Strickland* passage:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.

*Id.* (citation omitted).

While showing a different way to try the case, the PRP has not shown that the way Crowley tried it was wrong. Accordingly, Owens is not entitled to relief and this petition should be denied. I, therefore, dissent.

Korsmo, J.

7